THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

\* \* \* \* \*

UNITED STATES OF AMERICA     \*    NO. M-19-CR-859
                                \*    McAllen, Texas
VS.                                \*
                                \*    3:20 p.m. - 5:52 p.m.
RAMON HIRAM OLIVARES       \*    May 14, 2019

\* \* \* \* \*

**ARRAIGNMENT/DETENTION HEARING**

BEFORE THE HONORABLE PETER E. ORMSBY
UNITED STATES MAGISTRATE JUDGE

\* \* \* \* \*

Proceedings recorded by electronic sound recording
Transcript produced by transcription service

*GLR TRANSCRIBERS*
9251 Lynne Circle
Orange, Texas 77630 \* 409-330-1610

2

 1   **APPEARANCES:**

 2   For the United States:

 3         MR. ANDREW R. SWARTZ
          **U.S. Attorney's Office**
 4        1701 W. Business Hwy. 83, Suite 600
          McAllen, Texas 78501
 5
     For the Defendant:
 6
          MR. CHRISTOPHER SULLY
 7        **Law Office of Chris Sully**
          5804 N. 23rd Street
 8        McAllen, Texas 78504

 9   U.S. Pretrial:

10        DAISY MONTEMAYOR

11   U.S. Marshal Service:

12        PETE DE LUNA

13   Court Interpreter:

14        MARIA E. FORAKER

15   Case Manager:

16        CARMEL RAMIREZ

17   Electronic Recorder:

18        OMAR ORTA

19

20

21

22

23

24

25

3

1

**I N D E X**

2 ARRAIGNMENT.....................................   4

3 <u>DETENTION HEARING</u>

4 Government's Evidence:

5    Agent Joshua Banuelos

6       Direct Examination by Mr. Swartz.......   8

7       Cross-Examination by Mr. Sully.........  44

8       Redirect Examination by Mr. Swartz.....  77

9       Recross-Examination by Mr. Sully.......  82

10 Argument by the Government.....................  85

11 Argument by the Defense........................  93

12 Ruling by the Court............................ 102

13

14

15

16

17

18

19

20

21

22

23

24

25

4

```
 1              P R O C E E D I N G S
 2           3:20 P.M. - MAY 14, 2019
 3           THE COURT:  Okay.  Next is Criminal Case No.
 4   M-19-859, United States vs. Ramon Hiram Olivares.
 5           MR. SWARTZ:  Good afternoon, Your Honor.
 6   Andrew Swartz for the United States.
 7           MR. SULLY:  Good afternoon, Your Honor.
 8   Chris Sully for Mr. Olivares.  We're present and ready.
 9           THE COURT:  Okay, good afternoon.  And we'll
10   start by addressing the arraignment in Mr. Olivares'
11   case.
12              And Mr. Olivares, I do need to ask you
13   questions under oath for purposes of the arraignment.
14   If you'd please raise your right hand, the clerk will
15   place you under oath at this time.
16           COURT CLERK:  Do you solemnly swear that on
17   the testimony you're about to give in the case now
18   before the Court will be the truth, the whole truth,
19   and nothing but the truth, so help you God?
20           DEFENDANT OLIVARES:  Yes.
21           THE COURT:  Okay.  And Mr. Sully, did you have
22   an announcement as to the arraignment for Mr. Olivares?
23           MR. SULLY:  Yes, Your Honor.  I've gone over
24   the Indictment with him.  I believe he's mentally
25   competent, I believe he understands what he is charged
```

1   with and the possible ranges of punishment.  I believe
2   that he intends to waive the reading of the Indictment
3   and enter a plea of not guilty to all the charges, Your
4   Honor.
5           THE COURT:  Okay, thank you.
6                And sir, again to confirm your name is
7   correctly reflected on the Indictment, it is Ramon
8   Hiram Olivares; is that right?
9           DEFENDANT OLIVARES:  Yes.
10          THE COURT:  And, sir, you have been able to
11  review the Indictment with your attorney and discuss
12  the charges alleged in the Indictment with him?
13          DEFENDANT OLIVARES:  Yes.
14          THE COURT:  And you've been also -- are you
15  able to understand the nature of the charges in the
16  Indictment and also able to understand the possible
17  penalties that could be imposed as to those?
18          DEFENDANT OLIVARES:  Yes.
19          THE COURT:  And, sir, I understand you wish to
20  waive the reading of the Indictment.  As you probably
21  heard me just mention to the gentleman just before you,
22  it just means we won't read it out loud in court here
23  this afternoon.  Is that correct, you wish to waive
24  that?
25          DEFENDANT OLIVARES:  Yes.

1          THE COURT:  And I understand also you wish to

2  plead not guilty.  And again, I just need to have you

3  announce your plea at this time.  How do you wish to

4  plead to the charges in the Indictment, guilty or not

5  guilty?

6          DEFENDANT OLIVARES:  Not guilty.

7          THE COURT:  I do find that Mr. Olivares is

8  competent for purposes of this arraignment based on the

9  representation of counsel.  He's entered pleas of not

10 guilty as to the charges being alleged in the

11 Indictment.  His case is assigned to Judge Hinojosa.  I

12 think Final Pretrial Conference is set for July 1st at

13 9:30.  Jury selection is set for July 2nd at 9:30.  The

14 deadline for motions is May 28.  The Government's

15 responses will be due June 17th.  And the deadline for

16 Motions for Continuance will be June 17th.  So those

17 dates will control further proceedings as to this case.

18          And again, Mr. Olivares, your attorney

19 will be able to help you in addressing your case on

20 that schedule or otherwise assist you going forward

21 with this.

22          We also need to address the issue of bond

23 as to Mr. Olivares.  In his case there's no presumption

24 against bond that would apply, so the burden remains

25 with the Government as far as moving forward on the

1  issue of bond.

2              I will take notice of the factual

3  information as set out in the Pretrial Services Report

4  except to the extent as clarified or corrected in

5  connection with the hearing.

6              And Mr. Swartz, what's the Government's

7  position on bond at this time as to Mr. Olivares?

8         MR. SWARTZ:  Your Honor, the Government moves

9  for detention on grounds that the defendant is a

10  flight risk and there's no condition or combination of

11  conditions to reasonably secure his appearance at

12  future proceedings.  In support of that, the Government

13  has here to testify today Special Agent Joshua Banuelos

14  with the FBI.

15         THE COURT:  Okay.  And you do want to go ahead

16  and call the agent to testify?

17         MR. SWARTZ:  Yes, Your Honor.

18         THE COURT:  Okay, so we'll go ahead and take

19  that up.

20              And Mr. Olivares, you can have a seat at

21  counsel table with your attorney and we'll go forward

22  with the hearing.

23         COURT CLERK:  Please raise your right hand.

24  Do you solemnly swear that on the testimony you're

25  about to give in the case now before the Court will be

 1  the truth, the whole truth, and nothing but the truth,

 2  so help you God?

 3            THE WITNESS:  I do.

 4            THE COURT:  You can go ahead and proceed.

 5        **AGENT JOSHUA BANUELOS, CALLED BY THE GOVERNMENT**

 6                    **DIRECT EXAMINATION**

 7  **BY MR. SWARTZ:**

 8  Q.   Good afternoon.

 9  A.   Good afternoon.

10  Q.   Would you please state your full name for the

11  record.

12  A.   Joshua Banuelos.

13  Q.   With whom are you employed?

14  A.   With the Federal Bureau of Investigation.

15  Q.   What's your title?

16  A.   Special Agent.

17  Q.   How long have you been a Special Agent with the FBI?

18  A.   Nine years.

19  Q.   Are you currently assigned to a particular unit

20  within the FBI?

21  A.   I'm assigned the squad that investigates violations

22  related to white collar crime, which includes health

23  care fraud and complex financial crimes.

24  Q.   How long have you been assigned to that particular

25  squad?

Agent Joshua Banuelos - Direct by Mr. Swartz                          9

1   A.   I've been assigned to that squad for five years.

2   Q.   Was that just within McAllen?

3   A.   Yes, sir.

4   Q.   Have you worked for the FBI in other locations in

5   the United States?

6   A.   I have.

7   Q.   Where else?

8   A.   I also worked in the Los Angeles Division and I was

9   also assigned to the white collar squad as well.

10  Q.   For how long was that?

11  A.   Four years.

12  Q.   So have you been with the White Collar Crime Unit

13  within the FBI for nine years?

14  A.   Yes, sir.

15  Q.   Did you conduct an investigation relating to the

16  defendant, Ramon Hiram Olives?

17  A.   Yes.

18  Q.   Are you familiar with the Indictment that was

19  returned by the Grand Jury against Mr. Olivares?

20  A.   Yes.

21  Q.   I want to just ask you just some general questions

22  about the Indictment.  The first 21 counts of the

23  Indictment are bank fraud; is that correct?

24  A.   That's correct.

25  Q.   And within the 2012 to 2000 time period -- I'm

1  sorry, 2012 to 2014 time period, was Mr. Olivares an

2  employee of a home health company called Manos de Oro?

3  A.   Yes.

4  Q.   And did Mr. Olivares have a bank account with

5  Wells Fargo under a business called Mr. O's Travel?

6  A.   Yes, he did.

7  Q.   Based on your investigation, did you find that

8  checks to various third parties were deposited into

9  Mr. Olivares' Wells Fargo bank account?

10 A.   Yes.

11 Q.   Did the checks that were deposited into that

12 account appear to be payroll checks from Manos de Oro

13 to other individuals?

14         MR. SULLY:  Objection, leading, Your Honor.

15         THE COURT:  Okay.  The formal rules of

16 evidence actually don't apply in connection with a bond

17 hearing, but I do think it would be better not to lead.

18 I mean, for background information that's fine, but

19 just as a general matter, that would be better in going

20 forward.  So you can go ahead and continue, but keep

21 that in mind, Mr. Swartz.

22         MR. SWARTZ:  Thank you, Your Honor.

23 BY MR. SWARTZ:

24 Q.   Can you describe for the Court what you noticed

25 about the checks that were deposited into Mr. Olivares'

1  bank account?

2  A.   With certain checks, the payees that we were

3  looking at, on the Memo line or the space where the

4  Memo line would appear on the check, it indicated in

5  some of the checks pay periods, date ranges indicating

6  that they could possibly be payroll checks.

7  Q.   The Indictment identifies 21 specific checks; is

8  that correct?

9  A.   Yes.

10 Q.   Is that all the checks that you identified as being

11 deposited into the Olivares bank account to these third

12 parties?

13 A.   No.

14 Q.   Approximately how many checks were deposited into

15 the bank account that you identified?

16 A.   Several hundred.  Over a hundred.

17 Q.   And approximately how much money did those checks

18 encompass?

19 A.   Between the individuals?

20 Q.   Yes.

21 A.   Approximately, roughly, about a quarter million

22 dollars.

23 Q.   And the Indictment refers to an individual with

24 initials R.P.  Who is R.P.?

25 A.   That is Rogelio Pena.

1  Q.   And the Indictment identifies an individual with

2  the initials S.B.   Who is S.B.?

3  A.   That is Soila Benitez.

4  Q.   The Indictment identifies an individual with the

5  initials J.G.   Who is J.G.?

6  A.   That is Jose de la Garza.

7  Q.   Now, I want to focus specifically with respect to

8  Mr. Pena with the initials R.P.   Approximately how many

9  checks did you identify as being written from Manos de

10  Oro to R.P. that were deposited into Mr. Olivares'

11  Wells Fargo bank account?

12  A.   I believe there was approximately 16 checks.

13  Q.   And approximately how much money -- what was the

14  total amount of money associated with those 16 checks?

15  A.   Approximately -- it would be 48,000, 49,000,

16  approximately.

17  Q.   Did you locate and interview Mr. Rogelio Pena?

18  A.   We did.

19  Q.   Did you ask Mr. Pena whether he had worked at

20  Manos de Oro?

21  A.   I did.

22  Q.   Did you show Mr. Pena the checks that you

23  identified as being written to him and deposited into

24  Mr. Olivares' bank account?

25  A.   We did.

Agent Joshua Banuelos - Direct by Mr. Swartz                          13

1  Q.   What was his response in seeing those checks?

2  A.   He had never seen those checks before.

3  Q.   Did those checks have signature endorsements on

4  them?

5  A.   They did.

6  Q.   And who purportedly signed those checks?

7  A.   When looking at the checks, it appears that it is a

8  signature that you can make out Rogelio Pena.

9  Q.   And did you ask Mr. Pena about the signature on

10 those checks?

11 A.   We did.

12 Q.   What did he say?

13 A.   That that was not his signature.

14 Q.   Did Mr. Pena provide you with any information about

15 where he was working during the 2012 to 2014 time

16 period?

17 A.   Yes, he indicated to us that he was employed as a

18 professor at a university in Mexico during the time

19 frame.

20 Q.   And did the checks associated with Mr. Pena, or at

21 least had Mr. Pena's name on it and that were deposited

22 into the Olivares bank account, did those checks appear

23 to be payroll checks?

24 A.   Some of them were referenced pay date ranges on

25 them on the Memo line.

1  Q.   And did Mr. Pena say whether he ever worked at

2  Manos de Oro?

3  A.   He said he had not worked for Manos de Oro.

4  Q.   Did Mr. Pena say anything about Mr. Olivares ever

5  asking for his Social Security number?

6  A.   He told -- provided statements to us that he

7  recalled his wife providing a Social Security number to

8  Mr. Olivares.

9  Q.   And what was the basis -- what did

10 Mr. Olivares' *(sic)* wife say about the basis for

11 requesting a Social Security number?

12 A.   According to Mr. Pena, his wife had a conversation

13 with Mr. Olivares with regards to Mr. Olivares

14 requesting a Social Security number of Mr. Pena because

15 he was purported to be an employee with the U.S.

16 Government and he wanted to inquire on the Social

17 Security number of Mr. Pena related to some sort of

18 visa or passport inquiry.  Those were Mr. Pena's

19 statements to us.

20 Q.   Okay.  And I think when I asked the question, I

21 misspoke and I said, "What did Mr. Olivares' wife say?"

22 What did Mr. Pena's wife say?

23 A.   Yes, that's what Mr. Pena advised us that that was

24 the conversation between his wife and Mr. Olivares.

25 Q.   During the course of conducting the investigation

1   into this case, did you locate a Facebook account

2   associated with Mr. Olivares?

3   A.   We did.

4   Q.   Did the Facebook account for Mr. Olivares say

5   anything about an employer?

6   A.   Yes.

7   Q.   What did the employer say on his Facebook account?

8   A.   On his employment status with the Facebook account,

9   it indicated "U.S. Government."

10  Q.   And turn to the individual identified in the

11  Indictment as with the initials S.B., and you indicated

12  that was Ms. Benitez?

13  A.   Yes, sir.

14  Q.   Approximately how many checks did you identify as

15  being written from Manos de Oro to Ms. Benitez that

16  were deposited into Mr. Olivares' Wells Fargo bank

17  account?

18  A.   Approximately maybe 20, approximately.

19  Q.   And approximately what was the sum, the dollar sum

20  associated with those checks?

21  A.   The ones that we initially found indicated

22  anywhere -- they ranged starting at 10,000 and then we

23  later discovered there were additional ones that

24  accumulated total of approximately 30,000.

25  Q.   Did you locate and interview Ms. Benitez?

1    A.   We did.

2    Q.   Did Ms. Benitez say whether or not she had worked

3    for Manos de Oro?

4    A.   She advised us that she was not an employee or

5    never employed with Manos de Oro?

6    Q.   Did you show Ms. Benitez the checks that were

7    purportedly from Manos de Oro written out to her that

8    were deposited into the Olivares bank account?

9    A.   We did show her the checks.

10   Q.   What was her response in seeing those checks?

11   A.   She indicated to us that up until we showed her

12   those checks on that date, she had never seen those

13   checks before.

14   Q.   Did those checks have endorsements on them?

15   A.   Yes.

16   Q.   And did you -- what purportedly was the signature

17   endorsement on those checks?

18   A.   So the signatures on the reverse side on the

19   endorsement of the check appeared to be that of

20   Ms. Soila Benitez, and an additional signature appeared

21   to be that of Mr. Olivares.

22   Q.   Did you show Ms. Benitez the signature that

23   purported to be of her?

24   A.   We did.

25   Q.   What was her response to seeing that signature?

Agent Joshua Banuelos - Direct by Mr. Swartz                    17

1   A.   She told us that that was not her signature.

2   Q.   And did she say specifically why she did not

3   believe that to be her signature?

4   A.   Yes, she advised us that the signature on the back

5   of the check endorsement was in cursive handwriting and

6   Ms. Benitez testified to us that she did not know how

7   to write in cursive, which at time she pulled out her

8   driver's license voluntarily, displayed it to us with

9   the signature block having her signature written in

10  print.

11  Q.   Now, did you ask Ms. Benitez whether she knew the

12  owner of Manos de Oro?

13  A.   We did, and she indicated to us that she did not

14  know the owner of Manos de Oro.

15  Q.   Did she say whether she ever worked for the owner

16  of Manos de Oro?

17  A.   No.   We asked her if she held any position with

18  Manos de Oro or outside Manos de Oro, such as

19  housekeeping, caretaking, or any other side job for the

20  owner of Manos de Oro, which she responded that she did

21  not.

22  Q.   I don't think I asked you this question about

23  Mr. Rogelio Pena.  Did you ask Mr. Pena if he knew the

24  owner of Manos de Oro?

25  A.   We did, and he also indicated to us that he did not

1  know the owner or recall meeting the owner of Manos de

2  Oro.

3  Q.   Did Mr. Pena say whether he'd ever provided any

4  handyman or contract services for the owner of Manos de

5  Oro?

6  A.   No.  His comments to us was he never worked any

7  type of handyman type of job description in the Rio

8  Grande Valley.

9  Q.   Now, the individual with the initials J.G., you

10  indicated that was Mr. Jose de la Garza?

11  A.   Yes, sir.

12  Q.   With respect to Mr. De la Garza, did you look at

13  checks that were deposited into the Olivares bank

14  account that were purportedly issued for Manos de Oro

15  to Mr. De la Garza?

16  A.   We did.

17  Q.   Approximately how many checks?

18  A.   It was approximately in the range of the thirties

19  checks, I believe.

20  Q.   And what was the dollar amount associated with

21  those checks?

22  A.   Approximately $100,000.

23  Q.   Did you locate and interview Mr. De la Garza?

24  A.   We did.

25  Q.   Did Mr. De la Garza say whether or not he had ever

Agent Joshua Banuelos - Direct by Mr. Swartz                    19

```
 1  worked for Manos de Oro?
 2  A.   He said that he did not work for Manos de Oro.
 3  Q.   Did you show the checks to Mr. De la Garza?
 4  A.   We did.
 5  Q.   And what was his response to seeing the checks?
 6  A.   He was a bit taken aback, but he also indicated
 7  that he had never seen the checks.  We also showed him
 8  the signature on the back, as we did with the other
 9  individuals, and which he told us that the signature on
10  the back, the endorsement on the back of the check was
11  not his.
12  Q.   And did you ask Mr. De la Garza whether he had ever
13  worked for the owner of Manos de Oro?
14  A.   We did.
15  Q.   What did he say?
16  A.   He said he had not worked for the owner Manos de
17  Oro and did not recall meeting her.  And also any type
18  of odd jobs or handyman work, he did not perform for
19  the owner of Manos de Oro.
20  Q.   Now, did the name Dora Olivares ever come up in
21  your investigation?
22  A.   Yes.
23  Q.   Who do you understand Dora Olivares to be?
24  A.   That is Mr. Ramon Hiram Olivares' sister.
25  Q.   During that 2012 to 2014 time period, was it your
```

1   understanding that Ms. Olivares was married to Jose de

2   la Garza?

3   A.   Yes.

4   Q.   And is that the same Jose de la Garza whose checks

5   we've been discussing?

6   A.   Yes, sir.

7   Q.   And during the investigation, did investigators

8   find checks issued from Manos de Oro that were payable

9   to Dora Olivares?

10  A.   We did.

11  Q.   Were there checks from Manos de Oro to Dora

12  Olivares deposited into Hiram Olivares' bank account?

13  A.   Yes, there was.

14  Q.   Were there instances where there were checks to

15  both Jose de la Garza and Dora Olivares deposited into

16  the Hiram Olivares bank account at the same time?

17  A.   Yes.

18          MR. SWARTZ:  May I approach the witness, Your

19  Honor?

20          THE COURT:  Yes, sir.

21          *[Pause]*

22          MR. SWARTZ:  Your Honor, I'm handing the

23  witness what's been marked as Government's Exhibit 1.

24  BY MR. SWARTZ:

25  Q.   What is Government's Exhibit 1?

1   A.   This is a deposit slip for the Wells Fargo bank

2   account of Mr. O's Travel that indicates a copy of the

3   deposit slip with the corresponding checks associated

4   with the deposit.

5   Q.   And were these -- is this a deposit slip for checks

6   deposited into Mr. Olivares' bank account at Wells

7   Fargo?

8   A.   Yes, sir.

9   Q.   I'd like you to turn --and is the total amount

10  $11,131.34?

11  A.   Yes.

12  Q.   I'd like you to turn to the first check.   What is

13  that check?

14  A.   It's a check payable to Mr. Rogelio R. Pena from

15  Manos de Oro in the amount of $3,000.

16  Q.   Would this be one of the checks that you showed to

17  Mr. Pena?

18  A.   It was.

19  Q.   And is this one of the checks that Mr. Pena said he

20  did not receive?

21  A.   That's correct.

22  Q.   And the signature on the check to Mr. Pena, what

23  did he say about that signature?

24  A.   He advised us that that was not his signature.

25  Q.   And the signature below that, who do you understand

1  that to be?

2  A.   It appeared to be that of Mr. Olivares.

3  Q.   And the stamped "Mr. O's Travel, For Deposit Only,"

4  what do you understand Mr. O's Travel to be?

5  A.   Mr. O's Travel is a business account that is owned

6  by Mr. Olivares.

7  Q.   And there's a name and address on the check.  The

8  address states 927 South Washington, Mercedes, Texas

9  78570.  What do you understand that address to be?

10  A.   We understand that address to be that of

11  Mr. Olivares' parents.

12  Q.   And now if you turn the page, is that a check to

13  Jose Rene de la Garza?

14  A.   Yes, sir.

15  Q.   And would this be one of the checks that you showed

16  to Mr. De la Garza?

17  A.   Yes, it is.

18  Q.   What did he say about this and the other checks you

19  showed him?

20  A.   Mr. De la Garza indicated to us that the

21  endorsement on the back of the check was not his and he

22  did not really -- he did not authorize the signature.

23  Q.   And there's a name and address on the check.  The

24  address is 927 South Washington Avenue, Mercedes,

25  Texas.  What do you understand that address to be?

1  A.   We understand that to be the address of

2  Mr. Olivares' parents.

3  Q.   I'd like to turn the page.  Is that a check to Dora

4  Olivares?

5  A.   Yes, sir.

6  Q.   And what is the address for Dora Olivares on that

7  check?

8  A.   The address on there is 927 South Washington

9  Avenue --

10         MR. SULLY:  Your Honor, we would object to

11  relevance.  That's not one of the payees that's listed

12  in the Indictment, so there's no point in trying to

13  bring that up.

14         THE COURT:  Okay.  I'm going to go ahead and

15  allow it since it's related to the sequence of events

16  here.  You can go ahead.

17  BY MR. SWARTZ:

18  Q.   So, for those checks all at the same address, do

19  those checks also list in the Memo line a pay period?

20  A.   Yes, sir.

21  Q.   And is it all the same pay period?

22  A.   Yes.

23  Q.   And then the last check, who is that check to?

24  A.   The check is payable to Esmeralda Trevino.

25  Q.   Who do you understand Esmeralda Trevino to be?

1  A.   We understand that to be a very close friend of

2  Mr. Olivares'.

3            MR. SULLY:   Same objection, Your Honor.

4  That's not one of the payees in the Indictment.

5            THE COURT:   Okay, that's overruled.

6  BY MR. SWARTZ:

7  Q.   And does Ms. Olivares have a connection to the

8  individual that's identified in the money laundering

9  count of the Indictment?

10  A.   Ms. Olivares?

11  Q.   I mean, I'm sorry, not Ms. Olivares.  Ms. Trevino.

12  A.   She also received checks from Manos de Oro that

13  were deposited into Mr. O's Travel Wells Fargo bank

14  account.

15  Q.   And does she have a connection to a Mr. Virgil

16  Carillo?

17  A.   She does.

18  Q.   What's the connection to Mr. Virgil Carillo?

19  A.   So Ms. Trevino's daughter shares a child with

20  Mr. Carillo.  I do not recall if they're officially

21  married, but it could be indicated that she is Virgil's

22  mother-in-law.

23  Q.   And is Mr. Carillo the individual that's identified

24  as "CC-1" in the money laundering conspiracy count of

25  the Indictment?

1   A.   Yes.

2   Q.   Did you attempt to interview Ms. Dora Olivares?

3   A.   We did.

4   Q.   Could you just describe for the Court the various

5   attempts you made to interview Ms. Olivares?

6   A.   We made multiple attempts.  Initially, we visited

7   the address at 927 South Washington Avenue, Mercedes,

8   Texas, in which we left a business card at the door

9   requesting her to contact us.  We did not receive a

10  call back within a reasonable amount of time, which was

11  a period of days.

12        We visited a second time, in which that time

13  we made contact which we believed to be Ms. and

14  Mr. Olivares' father, in which we specified  that we

15  wanted to -- we were requesting to speak to

16  Mr. Olivares; provided him with an additional business

17  card, if I recall; and he advised us that he would

18  forward the message because Mr. Olivares was out of

19  town at that time.

20        When we did not receive a call back, we

21  visited again within a few days.  Mr. Olivares, her

22  father, advised us that she actually was staying a

23  little bit past the initial time frame, but he told us

24  that she was returning and that she would -- that he

25  would pass along the message as soon as she got back

1  into town.

2  Q.   And referring back to Government's Exhibit 1, the

3  check to Ms. Olivares, the amount of the check in

4  Government's Exhibit 1 to Ms. Olivares is $1,881.34; is

5  that right?

6  A.   Correct.

7  Q.   Now, were there numerous checks issued from Manos

8  de Oro to Ms. Olivares?

9  A.   Yes.

10  Q.   And were there amounts greater than that $1800

11  issued to Ms. Olivares?

12  A.   Yes, there were.

13  Q.   What would the amounts go up to?

14  A.   They ranged up to $3,000 up to $5,000, if I recall

15  correctly

16  Q.   And did those checks also have the same pay period

17  Memo line?

18  A.   Yes.

19  Q.   And would that be a two-week pay period?

20  A.   Yes, sir.

21  Q.   During the course of your investigation, did you

22  also speak with a representative of Wells Fargo Bank?

23  A.   We did.

24  Q.   Did Wells Fargo Bank state whether they would have

25  accepted checks if they knew that the endorsement of

1   the payee on the checks was forged?

2   A.   We were advised by the Subject Matter expert by

3   Wells Fargo Bank that they would not have accepted

4   third-party checks into the account if they had

5   knowledge that the endorsements had been forged.

6   Q.   And did the representative of Wells Fargo say

7   whether Wells Fargo would have accepted the checks if

8   the payees had not authorized Mr. Olivares to deposit

9   the checks into his account?

10  A.   They would not have accepted them.

11  Q.   Now I want to turn to Count 22 of the Indictment,

12  which is the money laundering conspiracy.  You

13  indicated that the individual identified as "CC-1" in

14  the Indictment is a Mr. Virgil Carillo?

15  A.   Yes.

16  Q.   Was Mr. Carillo charged with any offenses recently?

17  A.   He was charged with some drug related offenses with

18  another federal agency.

19  Q.   Was it drug trafficking charges?

20  A.   I believe so.

21  Q.   Did you have an opportunity to interview

22  Mr. Carillo?

23  A.   We did.

24  Q.   Did Mr. Carillo state whether or not he was

25  involved in drug trafficking?

1   A.   He did.

2   Q.   Did he state whether or not his father was involved

3   in drug trafficking?

4   A.   Yes, he's indicated that his family had a known

5   history of drug trafficking.

6   Q.   Did he state whether or not his uncle was involved

7   in drug trafficking?

8   A.   I believe so.

9   Q.   Now, earlier you mentioned that Ms. Esmeralda

10  Trevino, was that Mr. Carillo's mother-in-law?

11  A.   Yes, sir.

12  Q.   Did you have the opportunity to interview

13  Ms. Trevino?

14  A.   We did.

15  Q.   Did Ms. Trevino say whether or not she was aware

16  that Mr. Carillo was involved with drug trafficking?

17  A.   Yes, she told us that she knew of his history, his

18  past, and also his family relatives involved in the

19  same type of illegal activity.

20  Q.   And Ms. Esmeralda Trevino is Mr. Olivares' best

21  friend?

22  A.   She indicated to us that they were very good

23  friends.

24  Q.   Now, at some point, based on your investigation,

25  did Mr. Olivares approach Mr. Carillo with a

1  proposition?

2  A.   During the investigation, that is what we were

3  advised.

4  Q.   Could you describe for the Court what you learned

5  about that proposition?

6  A.   So we learned that at a social gathering, that

7  Mr. Olivares and Mr. Carillo had a conversation with

8  regards to Mr. Olivares being able to put Mr. Carillo

9  on the payroll of Manos de Oro as -- that it would

10 appear that he would be an employee of that company.

11 With Mr. Carillo's current status or history of drug

12 trafficking, they came up with an agreement that

13 Mr. Carillo would take his illegal proceeds and

14 exchange them with Mr. Olivares -- would exchange a

15 check from Manos de Oro for the exact same amount.  So,

16 if Mr. Olivares had a check from Manos de Oro payable

17 to Mr. Carillo in the amount of $5,000, Mr. Olivares

18 would provide Mr. Carillo the check; and in return,

19 Mr. Carillo provided $5,000 cash to Mr. Olivares.

20 Q.   And through the course of your investigation, did

21 you identify checks that were issued from Manos de Oro

22 to Mr. Carillo?

23 A.   We did.

24 Q.   Can you describe for the Court where those checks

25 were deposited?

1  A.   They were deposited into Mr. O's Travel account.

2  Q.   Were there also checks deposited into the bank

3  account of Mr. Carillo?

4  A.   Yes, there were.

5  Q.   And were the checks to Mr. Carillo, were they made

6  to look like payroll checks?

7  A.   Some of them had the pay period dates on them.

8  Q.   Now, when you interviewed Mr. Carillo, did he say

9  whether or not he was ever actually an employee of

10  Manos de Oro?

11  A.   He indicated --

12         MR. SULLY:  Objection.  That would be covered

13  by the proffer agreement, so they wouldn't be able to

14  go into Mr. Olivares' statement -- or I'm sorry, it

15  wasn't Mr. Olivares' statement.

16         THE COURT:  I think he's talk about

17  Mr. Carillo's statement.

18         MR. SULLY:  Very well.

19  BY MR. SWARTZ:

20  Q.   You may answer.

21  A.   Can you repeat the question?

22  Q.   Sure.  When you interviewed Mr. Carillo, did he

23  ever say whether or not he was an employee of Manos de

24  Oro?

25  A.   He advised us that he was never an employee of

 1  Manos de Oro and that he never even visited the
 2  business of Manos de Oro.
 3  Q.   Did Mr. Carillo even know where Manos de Oro was?
 4  A.   He advised us he did not know where Manos de Oro
 5  was located.
 6  Q.   Did you, through the course of your investigation,
 7  have the opportunity to interview employees as to
 8  whether or not they had ever seen Mr. Carillo at Manos
 9  de Oro?
10  A.   We attempted to interview employees that we
11  identified during the time frame of what would have
12  purported to have been Mr. Carillo's duration of
13  employment.   We talked to a few ex-employees of Manos
14  do Oro, who did not recall the name of Mr. Carillo; as
15  well as a photo shown to them, that they did not
16  recognize the individual in the photo.
17  Q.   You mentioned Ms. Esmeralda Trevino earlier.   Did
18  you talk to Ms. Trevino about Mr. Carillo?
19  A.   We did.
20  Q.   Did Ms. Trevino say whether or not she was employed
21  at Manos de Oro?
22  A.   She said she was an employee of Manos de Oro.
23  Q.   Did you ask her about Mr. Carillo being employed at
24  Manos de Oro?
25  A.   We did.

1  Q.   What did she say?

2  A.   She said that Mr. Carillo was an employee of Manos

3  de Oro.  And she also indicated to us that because of

4  his history with drug related activities, that she saw

5  that as a good faith that he was trying to turn his

6  life around by receiving a new job.

7  Q.   Based on your investigation, did you find

8  Ms. Trevino's statement about Mr. Carillo working at

9  Manos de Oro credible?

10  A.   We did not.

11          MR. SULLY:   Objection, calls for speculation,

12  Your Honor, regarding his state of mind.

13          THE COURT:   Okay.  You can go ahead.

14  BY MR. SWARTZ:

15  Q.   Did you get the impression that Ms. Trevino was

16  covering for Mr. Carillo?

17  A.   We believed that based on information that we had

18  already obtained.

19  Q.   Now, did you, through the course of the

20  investigation, also subpoena employment records from

21  Manos de Oro associated with Mr. Carillo?

22  A.   We did.

23  Q.   Did you subpoena employment records from Manos de

24  Oro associated with Mr. Carillo?

25  A.   We did.

1  Q.   Were any employment records provided in response to

2  that subpoena?

3  A.   I recall we received a W-2 form from Manos de Oro

4  in relation to his employment, but there was no other

5  documentation provided to us, such as a job application

6  or many of the documents that would have been

7  incorporated with an employee file.

8  Q.   I'm going to ask you about Count 23 in the

9  Indictment, which is for false statements.  Was

10 Mr. Olivares interviewed at the U.S. Attorney's Office

11 on or around March 29, 2019?

12 A.   Yes.

13 Q.   Were you present at that interview?

14 A.   I was.

15 Q.   Was Mr. Olivares accompanied by his counsel,

16 Mr. Sully?

17 A.   He was.

18 Q.   And at that interview, did Mr. Olivares sign a

19 proffer agreement?

20 A.   He did.

21 Q.   Have you seen the proffer agreement?

22 A.   I have.

23 Q.   Does the proffer agreement inform Mr. Olivares

24 about the importance of being truthful?

25 A.   Yes, there is a paragraph indicating that.

1  Q.   Does the proffer agreement state whether, if

2  Mr. Olivares makes materially false statements, he

3  could be charged with a false statement?

4  A.   It does.

5  Q.   During the interview, did Mr. Olivares make

6  materially false statements?

7  A.   Yes.

8  Q.   What did -- did you ask -- during the interview,

9  did you ask Mr. Olivares about Jose de la Garza?

10 A.   We did.

11 Q.   And what did Mr. Olivares say about Jose de la

12 Garza?

13 A.   That that was his ex-brother-in-law and that Mr.

14 De la Garza was not employed with Manos de Oro, but

15 rather performed side jobs or handyman work for the

16 owner of Manor de Oro, which was Ms. Nora Alanis.

17 Q.   Based on your investigation, was that statement

18 false?

19 A.   Yes.

20 Q.   Did you ask Mr. Olivares during that proffer

21 meeting, did you ask him about Rogelio Pena?

22 A.   We did.

23 Q.   What did he say about Mr. Pena?

24 A.   That Mr. Pena also was not a direct employee at

25 Manos de Oro, but rather had worked side jobs or

1   handyman work for Ms. Nora Alanis.

2   Q.   And based on your investigation, was that statement

3   false?

4   A.   It was.

5   Q.   During that same meeting, did you ask Mr. Olivares

6   about Ms. Soila Benitez?

7   A.   We did.

8   Q.   What did Mr. Olivares say about Ms. Benitez?

9   A.   She told -- excuse me, he advised us that she did

10  not work at Manos de Oro, but she was -- she provided

11  some sort of caretaking or a nanny type job description

12  for Ms. Olivares' children -- I'm sorry, Ms. Alanis'

13  children.

14  Q.   Based on your investigation, was that statement

15  false?

16  A.   It was.

17  Q.   During that same meeting, did you ask Mr. Carillo --

18  I mean, not Mr. Carillo.  Did you ask Mr. Olivares

19  about Mr. Carillo?

20  A.   We did.

21  Q.   What did Mr. Olivares say about Mr. Carillo?

22  A.   He indicated that he had known Mr. Carillo and had

23  known him like through social gatherings.  We also

24  asked about his employment at Manos de Oro.  And if I

25  recall, I believe he said that he was an employee of

Agent Joshua Banuelos - Direct by Mr. Swartz                    36

```
 1  Manos de Oro.
 2  Q.   Based on the investigation, was that statement
 3  false?
 4  A.   It was.
 5  Q.   Did you ask -- during that same meeting, did you
 6  ask Mr. Olivares about the checks that were deposited
 7  into the accounts of Jose de la Garza, Rogelio Pena,
 8  and Soila Benitez?
 9  A.   We asked about those checks, yes.
10  Q.   Did you ask what Mr. Olivares did with the funds
11  from those checks?
12  A.   He advised us that after the checks were deposited
13  into his business account, he would issue the funds for
14  those check amounts and then provided those funds in
15  cash to the payees, which would have been Ms. Benitez,
16  Mr. Pena, and Mr. De la Garza.
17  Q.   Based on your investigation, was that statement
18  false?
19  A.   It was.
20  Q.   Now, during -- at any point in the investigation,
21  has Mr. Olivares cooperated with the Government?
22  A.   No.
23  Q.   Now, I asked you earlier about Ms. Esmeralda
24  Trevino.  At some point did Mr. Olivares and
25  Ms. Trevino share a bank account?
```

Agent Joshua Banuelos - Direct by Mr. Swartz                    37

1   A.   They did.

2   Q.   And roughly what time period is that?

3   A.   Approximately 2015, if I recall.

4   Q.   I want to turn to kind of ask some just general

5   questions about Mr. Olivares.  Based on your

6   investigation, where was Mr. Olivares born?

7   A.   In Mexico.

8   Q.   And did you have occasion to obtain or attempt to

9   obtain an address for Mr. Olivares?

10  A.   We did.

11  Q.   What was the address that you obtained for him?

12  A.   The address we obtained was 927 South Washington in

13  Mercedes.

14  Q.   Did you go to that address?

15  A.   We did.

16  Q.   Did you speak to someone at that address?

17  A.   We did.

18  Q.   Who was it?

19  A.   We spoke to Mr. Olivares' father.

20  Q.   Did Mr. Olivares' father say anything about whether

21  or not Mr. Olivares lived at that address?

22  A.   We asked Mr. Olivares if he lived there, and if I

23  recall, Mr. Olivares' father replied that he wasn't

24  home at the time, and that he also indicated that he

25  kind of comes and goes and stays at the house

1  occasionally, but also visits Mexico and stays in

2  Mexico.

3  Q.   During the course of attempting to locate

4  Mr. Olivares, did you also find an address associated

5  with Mr. Olivares' cell phone?

6  A.   We did.  After failed attempts into locating

7  Mr. Olivares at the address on South Washington, we

8  visited an address in Pharr that had been tied to

9  Mr. Olivares' cell phone number, although the date

10 purported was historic and dated.  Since we were unable

11 to locate Mr. Olivares at his house, we went ahead and

12 covered that lead and made contact with a female at

13 that residence.

14 Q.   And did the female at that residence indicate

15 whether she was familiar with Mr. Olivares?

16 A.   She did.  She indicated that she knew him.

17 Q.   And did you discuss with the female at that

18 residence that Mr. Olivares' cell phone was associated

19 with the address at that residence?

20 A.   Yes, the female was inquiring of us as to why we

21 were even at her house since Mr. Olivares did not live

22 there.  I shared with her a bit of information that

23 this address had been listed on his cell phone for a

24 period back, which she expressed concern as to why his

25 cell phone was tied to her address.

Agent Joshua Banuelos - Direct by Mr. Swartz                    39

1  Q.   What was the reaction of the female as to learning

2  that his cell phone was associated with that address?

3  A.   She was concerned, but we did ask her if she would

4  be willing to attempt to call Mr. Olivares in an

5  attempt for us to make contact with him, in which she

6  agreed to.

7  Q.   And what happened?

8  A.   She made the phone call and a male on the line

9  answered on the other line, which purported to have

10 been Mr. Olivares, but it was a bad connection.  It

11 appeared as she was trying to say hello and

12 Mr. Olivares, or purportedly Mr. Olivares, also

13 responding in hellos back and forth not really hearing

14 each other.

15 Q.   And had you tried to contact Mr. Olivares at that

16 phone number?

17 A.   Yes.  I called a few minutes after we left that

18 residence and I also received the same type of

19 interaction that the female had with Mr. Olivares.  And

20 then we attempted to call him a couple more minutes and

21 there was no answer.

22 Q.   I asked you earlier about a Facebook page

23 associated with Mr. Olivares.  At any time looking at

24 that Facebook page, were there instances where

25 Mr. Olivares tied himself at being at a particular

 1  location?

 2  A.   Yes, we reviewed the Facebook profile and there was

 3  postings with family relatives in addition to him being

 4  tied to Facebook in Nuevo Progreso.

 5  Q.   So, based on the Facebook pages you looked at,

 6  there were instances where Mr. Olivares was tied as

 7  being in Mexico?

 8  A.   Yes, sir.

 9  Q.   During the course of your investigation, did you

10  also obtain border crossings associated with

11  Mr. Olivares?

12  A.   We did.

13  Q.   Now, do the -- what information generally does the

14  border crossing reports show?

15  A.   Generally, it will show the plate number that was

16  captured for the inbound crossing, but also captures

17  the Port of Entry code number associated with that

18  port.  It also captures the time that the crossing

19  occurs.  And in addition, depending on the information

20  that's provided in that database, it may provide a date

21  of birth.

22  Q.   Now, did you look at the border crossings

23  associated with Mr. Olivares for the kind of year

24  leading up to the Indictment?

25  A.   We did.

1  Q.   Approximately how many border crossings does it

2  show for Mr. Olivares for that year period?

3  A.   I believe it was approximately 246 or 264.

4  Q.   Was that all from one Port of Entry or multiple

5  Ports of Entry?

6  A.   There were multiple Ports of Entry.

7  Q.   What Ports of Entry do you remember?

8  A.   There was the Hidalgo Port of Entry, Anzalduas, the

9  Port of Entry in Brownsville, as well as the Progreso

10  Port of Entry.

11  Q.   The border crossing reports, does it show the time

12  of entry?

13  A.   It does.

14  Q.   Did you notice anything unusual about the times of

15  entry associated with Mr. Olivares?

16  A.   Yes.  The inbound crossings typically were in the

17  very late evening into the early morning hours.  So

18  anywhere at a timing from 11:30 to 2:00 a.m. --

19  11:30 p.m. to 2:00 a.m.

20  Q.   Based on reviewing the border crossing history,

21  were there instances where Mr. Olivares entered the

22  United States multiple times in a day?

23  A.   Yes.

24  Q.   Approximately how many times did Mr. Olivares enter

25  the United States say twice on the same day?

1  A.   There were a few instances that we received

2  information on that.

3  Q.   Were there instances where Mr. Olivares entered the

4  United States three times in one day?

5  A.   Yes.

6  Q.   For any of those occasions where he entered the

7  United States three times in one day, were there

8  instances where Mr. Olivares entered the United States

9  on that same day through multiple ports of entry?

10 A.   Yes, we -- the records indicated that there was

11 some cases that there was three entries into the United

12 States within the same day, they were all -- or not

13 all, but there were some where they were done at

14 different Ports of Entry in the same day.

15 Q.   And during your investigation, you reviewed the

16 bank accounts associated with Mr. Olivares?

17 A.   Yes.

18 Q.   Did you notice anything unusual about withdrawals

19 from Mr. Olivares' account?

20 A.   So, through analysis of the bank account, when we

21 would see deposits occurring, which were related to the

22 checks that we were investigating, withdrawals followed

23 those deposits and the withdrawals were at multiple

24 branch locations occurring on the same day.

25 Q.   What were some of the amounts of those withdrawals

1  that you remember seeing?

2  A.   They varied, anywhere from $1,000 up to $3,000,

3  $4,000, but they were cumulative of over $10,000 in

4  some instances.

5  Q.   Based on your investigation, did Wells Fargo have

6  concerns about that withdrawal pattern?

7  A.   They did.

8  Q.   What were some of those concerns you identified

9  through the course of your investigation?

10 A.   The concerns were the multiple withdrawals in a

11 single day at various branch locations throughout the

12 Rio Grande Valley, in addition to the third-party

13 checks being deposited into the business account.

14 Q.   Now, having conducted the investigation,

15 Mr. Banuelos, are you aware of any condition or

16 combination of conditions that you think would secure

17 Mr. Olivares' appearance at future appearances?

18       MR. SULLY:  Objection, Your Honor, asks for an

19 improper opinion.  That's the Court's purview.

20       THE COURT:  Okay.  I mean, we probably don't

21 need him to opine on that since that's a decision the

22 Court would have to make, Mr. Swartz.

23       MR. SWARTZ:  Thank you, Your Honor.

24 BY MR. SWARTZ:

25 Q.   Is the individual you understand to be Mr. Olivares

Agent Joshua Banuelos - Cross by Mr. Sully                        44

1   in the courtroom today?

2   A.   Yes.

3   Q.   Could you please point out and identify an article

4   of clothing he's wearing, Mr. Ramon Hiram Olivares?

5   A.   Yes, he's wearing a red tee shirt.

6           MR. SWARTZ:  Your Honor, may the record

7   reflect the witness has identified the defendant?

8           THE COURT:  Okay.  Yes, it will.

9           MR. SWARTZ:  Pass the witness, Your Honor.

10          THE COURT:  Okay.  Mr. Sully, do you have any

11  questions?

12          MR. SULLY:  Yes, thank you, Your Honor.

13          THE COURT:  Okay.  Yes, sir.

14                      **CROSS-EXAMINATION**

15  **BY MR. SULLY:**

16  Q.   Good afternoon, Special Agent Banuelos.

17  A.   Good afternoon.

18  Q.   Before I follow up on some of those topics, have

19  you written or reviewed any reports regarding the

20  topics that you testified about today?

21  A.   Have I read and reviewed reports?  Yes, sir.

22  Q.   All right, do you have them with you today?

23  A.   I do not.

24          MR. SULLY:  Your Honor, we believe we're

25  entitled to those reports under Rule 26.2, I believe,

 1  before we can cross-examine the witness.  Otherwise,

 2  his testimony should be struck.

 3       MR. SWARTZ:  Your Honor, in response, reports

 4  of witness interviews are not statements under *Jencks*

 5  or 26.2.  They're not statements that Mr. Banuelos has

 6  made himself.

 7            In addition, since we are at sort of a

 8  preliminary proceeding, basically, Mr. Sully is asking

 9  for discovery.  We're not -- this is the very stage of

10  the proceeding.  Rule 46 allows for good cause to allow

11  the witness to go forward without complying with Rule

12  26.2.

13       MR. SULLY:  Your Honor, if I may respond, Rule

14  26.2 specifically applies to a detention hearing.  It's

15  not trying to get discovery outside of what's required.

16  And if he wrote reports himself, that would definitely

17  be his own statement.  But the rule talks about

18  statements that he adopts even if they're not his own

19  statements that he originally made.  So he has done

20  that, he's basically repeated the hearsay statements

21  of other people.  He's basically adopted them and

22  presented them as truth to the Court.  So we're

23  entitled to see those statements that he's adopting on

24  whatever form they're recorded on.  Otherwise, we can't

25  fully cross-examine him.

Agent Joshua Banuelos - Cross by Mr. Sully                          46

1          MR. SWARTZ:  And, Your Honor, the Fifth

2    Circuit case, *U.S. vs. Martinez,* which is 87 F.3d, 731,

3    at 735 through 736, a case from 1996, the Court in that

4    case held that it was clear error for the Court to

5    order the Government to produce reports of witness

6    interviews when the report was not a verbatim

7    transcript and the report was not a statement within

8    the meaning of *Jencks,* and would also be 26.2.

9          THE COURT:  And what was the cite of that

10   again, Mr. Swartz?

11         MR. SWARTZ:  U.S. vs. Martinez, 87 F.3d, 731,

12   at 735 to 736.  And that's a Fifth Circuit 1996 case.

13         THE COURT:  Okay.  And Mr. Sully, the rule, of

14   course, states -- refers to a statement of the witness.

15   And as you mentioned, that includes statements that

16   the witness has adopted.  But I don't think that means

17   adopted in the sense that the witness agrees with the

18   statements or simply is testifying as to what, you

19   know, other people have said in the investigation.  And

20   I think the cases in other hearings like this where we

21   have explored this issue, the cases suggests that that

22   adoption is in a context where, for example, two people

23   go to interview somebody and one of the individuals

24   writes a report, the other individual ends up

25   testifying, and that individual is actually there, but

1   he's adopted the report as his report.  He was also

2   there as opposed to just any time an agent agrees with

3   something or relies on something that, you know, some

4   other agent has come up with.

5                So, for purposes of the hearing right now,

6   the ruling is going to be that unless you establish

7   that Mr. -- that Special Agent Banuelos has his own --

8   reviewed his own statement in connection with this

9   hearing and relied on that, then as to other types of

10  statements that are just, you know, included in the

11  investigation, I'm not going to require those to be

12  produced for purposes of the Probable Cause Hearing.

13               However, if there is any other authority

14  that you want to present on that, I would be willing to

15  consider that and re-open the hearing to require that

16  if it would seem that that's the legally correct thing

17  to do here.  But that's -- I'm just going to make that

18  ruling right now based on my understanding of what the

19  law is in the context of other hearings.  But if you

20  want to pursue that further, I'd certainly be willing

21  to consider that any other authority might have on

22  that.  But I don't think you've established that

23  there's any statement of the witness that he's relying

24  on as far as his testimony here.  So I'm not sure

25  there's anything right now that we would have that

1  would need to be presented.  But if you want to ask

2  more questions to develop that further, you can do that.

3            MR. SULLY:  Yes, Your Honor.  Thank you.

4  BY MR. SULLY:

5  Q.   To clarify, Special Agent, have you yourself

6  written reports in connection with this case?

7  A.   Yes.  They were also co-authored.

8  Q.   And how many reports have you authored or

9  co-authored?

10 A.   I can't recall the exact number at this time.

11 Q.   Do you know approximately?  Are we talking about

12 two or three?

13 A.   No, there would be approximately maybe 20 or 30

14 reports.

15 Q.   And have you provided testimony, say for example,

16 to the Grand Jury in connection with this case?

17 A.   No.

18            MR. SULLY:  Your Honor, we understand the

19 Court's ruling as to other people's reports or

20 statements, but if he himself has written 20 to 30

21 reports, then we believe that those would fall within

22 the rule.  Otherwise, the rule would be completely

23 eviscerated, Your Honor.  So we would ask to either for

24 those to be produced or for his testimony be struck.

25            THE COURT:  Well, and are you asking for a

1  continuance?  Because, obviously, he doesn't have

2  statements with him anyway.  Or how do you suggest we

3  proceed?

4          MR. SULLY:  I believe the only solution is to

5  strike his testimony, Your Honor, because otherwise the

6  Government is going to get another continuance.

7  They've already continued this from Friday.  They've

8  kept Mr. Olivares detained over Mother's Day weekend.

9  They knew -- they know about the rule, they know that

10 he's written 20 or 30 reports.  They shouldn't get to

11 prolong his attention simply because they're

12 withholding reports that the rule requires, Your Honor.

13          And the alternative, having to

14 cross-examine him without those reports and the Court

15 considering what he said without the opportunity to

16 fully cross-examine on the reports, would deprive us of

17 the ability to cross-examine this witness and confront

18 this witness, Your Honor.  So we're not asking for a

19 continuance, we're just asking for that testimony to be

20 struck unless the Government can comply with that

21 today, Your Honor.

22          THE COURT:  Well, the rule indicates that any

23 statement of the witness that is in their possession.

24 Are you saying that that implies that the witness has

25 to bring any report with him?  And if so, what do you

1  base that on?

2          MR. SULLY:  Yes, Your Honor, possession would

3  be the constructive possession if they can bring it to

4  court.  Otherwise, they could simply get around the

5  rule by saying, "Well, as long as I don't have it in my

6  pocket or at the stand, then I won't have to produce

7  it."  So the rule is basically possession of something

8  that they have access to.  He's indicated that he has

9  access to it and he could have brought it to court or

10  he could bring it to court.  He just for whatever

11  reason didn't.

12          MR. SWARTZ:  Your Honor, if I could just

13  inject one other point.  So, basically, what Mr. Sully

14  is asking, not for testimony that Mr. Banuelos

15  provided, but he's asking for every report that

16  Mr. Banuelos prepared in this case that is a summary of

17  what other individuals said.  They're not statements

18  that Mr. Banuelos said.  It's a report of statements

19  that other individuals said.  And so he's basically

20  asking for the Government to provide discovery of

21  every report to verify Mr. Banuelos in this case.

22              With respect to that request specifically,

23  even though 26.2 does apply to detention hearings,

24  Rule 46(j) specifically allows the Court to allow a

25  witness to testify without producing the reports to

1  comply with Rule 26 where there's good cause to show.

2                  And the 1993 amendment note to Rule 46(j)

3  states, "The Committee recognized that pretrial

4  detention hearings are often held very early in the

5  prosecution and that a particular witness's statement

6  may not yet be on file, or even known about.  Thus, the

7  amendment recognizes that in a particular case, the

8  court may decide that good cause exists for not

9  applying the rule."

10                 So, even if the rule applies to his

11 summary of what other people say, the Court can allow

12 for good cause Mr. Banuelos can go forward and testify

13 because we're very early in the case, discovery has not

14 occurred yet, and it doesn't make sense to delay the

15 detention hearing for Mr. Sully to conduct discovery.

16            THE COURT:  Okay.  So I'm going to defer

17 ruling on the issue of whether the testimony should be

18 struck and direct counsel to submit any authority that

19 would support that in this context.  And at this point

20 the witness does not have any statements with him, so

21 that's where we are.

22                 So, Mr. Sully, I'll leave it this way.  Do

23 you wish to go forward with cross-examination subject

24 to the Court possibly later requiring the Government to

25 produce the statements, or possibly ruling that the

 1  statements should be struck, or possibly ruling that it

 2  wasn't necessary to produce the statements in this

 3  context?  So how do you want to handle that?

 4          MR. SULLY:  Your Honor, in light of the

 5  Court's ruling, I'd like to continue with the hearing

 6  so I don't necessarily prolong Mr. Olivares' detention.

 7  So I'd like to continue with the cross-examination with

 8  what I have and present what we have for today, Your

 9  Honor.

10          THE COURT:  Okay.  And we'll discuss a little

11  bit later just a schedule for submitting any briefing

12  as far as those issues that we were just discussing.

13              Okay, you can go ahead and proceed, then.

14          MR. SULLY:  Thank you, Your Honor.

15  BY MR. SULLY:

16  Q.  Special Agent, I'd like to start with -- there are

17  a lot of topics that you've covered, obviously, but

18  with your communications with Mr. Olivares.  When was

19  the first time that you or any other agency in

20  connection with this case first tried to get in contact

21  with Mr. Olivares?

22  A.  I tried to make contact with Mr. Olivares in March

23  of 2019.

24  Q.  Okay, and that was you personally, right, in March

25  of this year?

Agent Joshua Banuelos - Cross by Mr. Sully                    53

1  A.   Yes, sir.

2  Q.   But before that, as early as January of this year,

3  one of the deputy marshals had already made contact

4  with Mr. Olivares; right?

5  A.   That's correct.

6  Q.   And as part of the investigation, you spoke with

7  that deputy marshal and got the information from that;

8  right?

9  A.   Yes, we received a copy of that -- or the summary

10 of that interview.

11 Q.   And so back in January was the first time that

12 someone from the Government spoke to the Mr. Olivares

13 about this investigation and asked him questions about

14 it; right?

15 A.   To my knowledge.

16 Q.   As far as the topics that they talked about, were

17 they pretty similar to the ones that were talked about

18 during the March interview that you testified about?

19 A.   They were similar topics, but I believe the one in

20 January was not as in-depth with the one that occurred

21 in March.

22 Q.   Do you know how long the one in January, how long

23 that conversation interview lasted?

24 A.   I do not, no, sir.

25 Q.   What about the one in March, do you remember how

Agent Joshua Banuelos - Cross by Mr. Sully                    54

1  long that one was?

2  A.   It was a couple of hours, as I recall.

3  Q.   And so in January deputies talked to him, and then

4  again in March was when you asked for an interview and

5  then you got the interview, you said, a couple of weeks

6  after that; right?

7  A.   I believe the interview occurred a week or two

8  after we were contacted by defense counsel -- or by

9  you, sir.

10 Q.   Right.  So the March interview, you said that

11 lasted about a couple of hours.  And without going

12 into, you know, details about what was said, there were

13 other topics or other questions besides the ones that

14 you've testified about; right?

15 A.   There were other topics discussed, as I recall.

16 Q.   And as far as the other answers that Mr. Olivares

17 gave or the other topics that were covered, there's no

18 allegation that any of those statements were false?

19 A.   Not to my knowledge.

20 Q.   And as far as the responses that he gave during the

21 January interview to your colleagues with the Marshal's

22 Office, as far as you know, there's no allegations that

23 anything he said during that interview was false either?

24 A.   Some of the statements that were -- that I read

25 through that were similar to the questions we asked

1  regarding some of the checks that were in question.
2  And I don't have a copy of the report with me, but if I
3  recall correctly, that Mr. Olivares had indicated that
4  he did deposit the third-party checks into his account
5  in the January interview.
6  Q.   So you're saying that he did deposit -- that he
7  admitted during the January interview that he did
8  deposit checks into his account?
9  A.   I believe he made comments to that.
10 Q.   Okay.  But you don't believe that to be false; in
11 fact, that's what you're saying happened, that the
12 checks were deposited into the account?
13 A.   Correct.  But in addition, I believe he provided
14 additional statements when they asked him as to his
15 reasoning behind depositing those items into his bank
16 account.  And also that having the signatures of the
17 payees and on the endorsements on the back were covered
18 as well.
19 Q.   Okay.  So, basically, the questions you testified
20 about in March, if those same questions were covered in
21 January, then you would have --
22 A.   To some degree.  But again, because I was not part
23 of that interview, I don't know what questions directly
24 were asked to Mr. Olivares or in what specific detail.
25 Q.   Okay.  Fair enough.  But at least as early as

1   January of this year, it would have been clear to

2   Mr. Olivares that he was under investigation by --

3   A.   I can't speculate as to what the nature of those

4   agents telling Mr. Olivares at that interview, whether

5   or not he was a subject or if he was a witness or if

6   they were simply looking for a statement.  I don't

7   know.

8   Q.   Okay.  But regarding the questions that were asked

9   in March, or questions that were asked about

10  Mr. Olivares, regardless of whether you remember the

11  word "subject" or "target" or not was used, the

12  questions that were being asked were investigating

13  Mr. Olivares personally; correct?  The questions

14  weren't all about other people?

15  A.   In the March interview we did ask questions about

16  other individuals related to his previous employment in

17  relation to the owner of Manos de Oro, if I recall, and

18  some other individuals that were associated with other

19  home health companies.  Because I recall he mentioned

20  doctor visits and things of that nature that we found

21  out at the time.  And then additionally, we asked other

22  questions regarding the checks and individuals that he

23  knew or purported to have known.

24  Q.   Okay.

25  A.   So there were various topics covered.

1  Q.   Right.  I guess what I'm saying is that obviously a

2  lot of the questions were about him and not just about

3  other people, but his own bank transactions and things

4  like that?

5  A.   Well, what his firsthand knowledge was of

6  interaction with individuals and companies and doctors.

7  Q.   Okay.  And so that interview was back in March and

8  you were the agent who went to arrest or take custody

9  of Mr. Olivares; right?

10  A.   Yes, I was.

11  Q.   And that was last Thursday, the 9th; correct?

12  A.   It would have been into Friday morning, if I'm

13  recalling, yes.

14  Q.   Late night or early morning?

15  A.   Yes, sir.

16  Q.   Okay.  And so during that time between January and

17  when you arrested Mr. Olivares this month, he didn't,

18  you know, go to live in Mexico or not come back, or you

19  don't have any information that he essentially fled the

20  jurisdiction?

21  A.   We reviewed the border crossings and the border

22  crossings were consistent with the pattern that -- or a

23  pattern that he established even the year leading up to

24  the date of the arrest.

25  Q.   So the border crossings, let's talk about that.

1   The border crossings you testified to, they were for

2   last year's, so 2018, or --

3   A.   We went back to 2017 up until the date of the

4   arrest.

5   Q.   Okay.  And you said it was pretty consistent from

6   2017 up to the arrest in May of 2019?

7   A.   Yes.  What I meant was that there was numerous

8   crossings that occurred on a consistent basis.

9   Q.   Okay.  So it didn't start after Government agents

10  first interviewed Mr. Olivares, it was pretty much a

11  consistent pattern since at least 2017?

12  A.   Yes.  I believe Mr. Swartz asked, the year leading

13  up to the arrest, there was I believe approximately 246

14  to 264 crossings for that whole year.

15  Q.   Okay.  And so you said sometimes there would be --

16  the crossings, though, how long -- he'd basically leave

17  and come back the same day or like in the middle of the

18  night the next day or what was the time frame you said

19  on those crossings?

20  A.   And so a review of the records indicated that

21  either he crossed back into the United States very

22  late in the evening, which I'm referring to close to

23  midnight.  In addition, if it wasn't at that time, it

24  would be 1:00, maybe 2:00, even 3:00 in the morning.

25  And then on some instances on that same day there was

1  another inbound crossing maybe at 8:00, 9:00, or 10:00

2  in the morning, which would conclude to us that maybe

3  he would have gone back into Mexico only to cross again

4  to have been captured on that report.

5  Q.   Okay.  But we're not talking about like multi-day

6  trips where he's gone for days or weeks and then comes

7  back later?

8  A.   No, there were some breaks inbetween sometimes.  So

9  on an average week there might have been anywhere from

10 four to five crossings throughout the day, even more

11 because if he crossed more than one time.  But

12 reviewing the records on some of the weekends, there

13 would be no activity.

14 Q.   Okay.  And you said the crossings, they're based on

15 the license plate and sometimes date of birth.  So are

16 the crossings associated with a particular vehicle or

17 with him personally or --

18 A.   They were associated with the plate numbers.  So,

19 when I refer to the date of birth, when we are

20 searching the database, we can either search the

21 database through the license plate number.  In

22 addition, we can plug in a unique identifiers also

23 because if it may be a plate that might have been

24 re-issued or just to kind of we put as much information

25 as we can to get a more detailed return.

Agent Joshua Banuelos - Cross by Mr. Sully                    60

1  Q.   Did you bring an actual copy of the crossings with

2  you or --

3  A.   I did not.

4  Q.   Okay.  So you don't know like how many of those

5  crossings exactly are based on the license plate number

6  versus an actual date of birth?

7  A.   Well, so, when we -- the license plate on the

8  vehicle recently changed to a new plate in mid-April, I

9  believe April 19th, a temporary tag.  At least that's

10 what our system reported because the previous one had

11 expired.  When we ran the database search, we initially

12 ran the initial license plate number that we had on

13 file believed to be that of Mr. Olivares.

14       In addition, because that data was historical

15 in years, we also inputted the date of birth and name

16 of the individual.  And that is because sometimes when

17 you just plug in a plate, you may not get a full

18 return.

19       In addition to that, when we were running a

20 search for a week or two-week time frame and we knew

21 that the vehicle or license plate number had changed,

22 we inputted the new vehicle plate number and received

23 that history.

24 Q.   Maybe I didn't ask the question --

25 A.   Oh, I'm sorry.

1  Q.  -- correctly enough.  What I meant was, do you

2  know, for the crossings you're testifying to, how many

3  of them were associated with a particular vehicle as

4  opposed to associated --

5  A.  They would all be associated with the plate number.

6  Q.  They're all associated with the plate number?

7  A.  Yes.  So, when we look at the chart, it will

8  respond the name in some cases of who may be tied to

9  that plate, which may also return a result of a date of

10 birth.

11 Q.  Okay.  But the actual crossing history doesn't tell

12 you who was in the car at the time, it just tells you

13 if the car came and went?

14 A.  Correct, and the number of passengers, if I'm not

15 mistaken.

16 Q.  Okay.  But it won't identify like the actual names

17 of passengers, or what?

18 A.  It will not, not to my knowledge.

19 Q.  So far as crossings, you don't actually know who

20 was in the car however many times it had crossed?

21 A.  Well, when we also did another search in the

22 database, we ran the search only with Mr. Olivares'

23 name and date of birth and received the same results to

24 compare them.

25 Q.  And that's based on actually identifying the person

1   in the car or just the fact that the car is associated

2   with him?

3   A.   Just that it's associated with him.  So it

4   identifies the Mr. Olivares that we plugged into the

5   database.

6   Q.   So that again is just telling you that that

7   particular car is associated with Mr. Olivares?

8   A.   That's correct.

9   Q.   Okay, not necessarily that he was in the car at

10  that particular moment?

11  A.   The report will not tell us -- no, it will not give

12  us that information.

13  Q.   Okay.  Now, as far as the -- as far as Mr. Olivares

14  himself, are you aware that he has -- his maternal

15  grandmother's sister lives in Progreso?

16  A.   I'm not aware of the exact relations, other than

17  we've received information that he has family relatives

18  in Mexico.

19  Q.   Okay.  But you don't know any specifics as far as --

20  A.   No, sir.

21  Q.   -- what relatives he has there?

22  A.   No.

23  Q.   But as far as his parents, you were able to verify

24  that they are both citizens and the both live at the

25  address that you testified about, right, from your

Agent Joshua Banuelos - Cross by Mr. Sully                              63

1   statement?

2   A.   Well, yes, we made contact with Mr. Olivares'

3   father at the address in Mercedes.

4   Q.   And that was one of the ways in which you got

5   contact with Mr. Olivares himself, right, was through

6   his father?

7   A.   That's correct.

8   Q.   And as far as Mr. Olivares himself, you've also

9   verified that he's a citizen; right?

10  A.   Yes.  When we obtained that information, I believe

11  he also mentioned to us that he had been naturalized

12  approximately four years ago.

13  Q.   Did you verify his employment history and also his

14  residence, that he's been living in the United States

15  for several decades now?

16  A.   So, when we did an open source database search, the

17  primary address that was repeatedly being returned was

18  the 927 South Washington address.  We did also verify --

19  we ran a records check through the Texas Workforce

20  Commission and saw multiple employers I believe to be

21  related in the home health industry or health care

22  industry.

23  Q.   Did you also verify that he had worked as a teacher

24  before some of those employments in the health care

25  field?

Agent Joshua Banuelos - Cross by Mr. Sully                                   64

1   A.   When we ran the report, we did not receive that

2   result, but that's not to say that he did not work

3   there.   It's just not the information that was returned

4   in the result.

5   Q.   Got it.   Were you able to verify that he doesn't

6   have any criminal history?

7   A.   Yes, we ran a criminal history check and we did not

8   find a criminal history on Mr. Olivares.

9   Q.   All right.   Now, going back to the information you

10  talked about regarding the allegations in the

11  Indictment, without going necessarily all one by one,

12  basically, you testified that a lot of these people

13  said they didn't work for Manos de Oro when you asked

14  them about the checks, right, or when they were asked

15  about the checks?

16  A.   Correct.

17  Q.   Did you -- did you check and see or were you aware

18  that these people had in fact declared income from

19  Manos de Oro on their tax returns?   Did you check any

20  of that information?

21  A.   So we were not able to obtain tax returns.   We did

22  request them from the individuals, but we did not

23  receive them back from the individuals, and through

24  other means we were unsuccessful in receiving the tax

25  returns.

1   Q.   So at this point all you have as far as whether or

2   not they worked for Manos de Oro or for the owner of

3   Manos de Oro in some other capacity is basically them

4   saying what they stated?

5   A.   In addition, when we did subpoena Manos de Oro for

6   any employee files associated with them, we only

7   received one file back, that of Mr. De la Garza.  Manor

8   de Oro advised us they had no record of any other

9   individuals that we subpoenaed as an employee of that

10  business.

11  Q.   Is that the one you said that you received a W-2,

12  but not other information?

13  A.   So we received a W-2 from Mr. Carillo that was

14  obtained through a subpoena, if I recall.

15  Q.   Okay.  And you said that you didn't receive like

16  job application or other types of employment records

17  besides the W-2.  Is that for Mr. Carillo or --

18  A.   That was for Mr. Carillo.  Now, when we requested

19  any and all documents associated with any employment

20  on, for example, Ms. Benitez or Mr. Pena and other

21  individuals, we did not receive any return back on

22  anything to include a W-2.  Some of those -- so some of

23  those files were not -- were not existent or not

24  produced by Manos de Oro because they advised us that

25  they did not have those records.

1  Q.   In your investigation, were you able to determine

2  whether Manos de Oro always gets a written job

3  application before hiring somebody, if that's something

4  you would expect to see or not?

5  A.   Well, when talked to the owners of Manos de Oro,

6  the ownership had changed by the time or at the time

7  that we were investigating.  So, as far as the job

8  applications being received during that time frame was

9  not what -- or excuse me, could have been different

10  from when the new owners advised us how they were

11  accepting job applications.

12  Q.   So the owners now, at the time that you were

13  requesting records from Manos de Oro, aren't the same

14  owners for the time period that's talked about in the

15  Indictment; correct?

16  A.   That's correct, they are different.

17  Q.   So they may not have all the records that they

18  previous owner had at the time?

19  A.   Well, they advised us that they had obtained what

20  they believed to have been every record from the

21  previous owner, which was Ms. Nora Alanis, which also

22  indicated, I believe, some storage unit that had all

23  the files since the inception of Manos de Oro.  So they

24  were given access to that information

25  Q.   Did you speak with the owner during this time

1  period, Ms. Alanis, to try to verify any of this

2  information?

3  A.   We did not.

4  Q.   So you haven't been able -- have you been able to

5  check with anybody who was involved during this time

6  period with Manos de Oro regarding, for example,

7  whether these people were employed or not?

8  A.   Well, we verified -- or excuse me, we interviewed

9  employees, which are now ex-employees of Manos de Oro,

10  during the time frame of which those individuals would

11  have also been employed at that time.  We gave them

12  names, which they advised us that they did not recall

13  the names.  Mr. Carillo's circumstance also, either we

14  provided Mr. Carillo's name to see if they recalled the

15  name.  In some cases I did not provide a name and,

16  rather, just showed a photo to see if they recognize a

17  photo, in which they responded that they had no

18  recollection of that individual ever working there.

19  Q.   And these people that you spoke to that were

20  employees during this time period, were any of their --

21  were they named in any of the checks that were

22  deposited into the account?

23  A.   No.

24  Q.   Now, as far as the time frame for these

25  transactions, the latest one listed in the Indictment

1  was in 2013; correct?  September of 2013?

2  A.   I'd have to see a copy, but I believe so.

3  Q.   Okay.  And then as far as -- those are the bank

4  fraud counts, 21 through -- sorry, 1 through 21.  As

5  far as Count 22, the money laundering account, what

6  were the time frames for the checks in that count?

7  A.   I believe they began in 2013 and went into the year

8  of 2014.

9  Q.   Okay.  Now, as far as the -- one thing, you said

10 you asked people whether they worked for Manos de Oro.

11 But as far as checking to see whether people worked for

12 the owner, Ms. Alanis, personally, there was one person

13 you said, I believe it was Ms. Benitez, that she -- you

14 investigated whether she worked as a nanny for the

15 owner of Manos de Oro at the time, Ms. Alanis; right?

16 A.   That's correct.  We asked her if she had been

17 employed as a nanny or caretaker of some sort for

18 Ms. Alanis' children.

19 Q.   And besides asking her, did you verify or try to

20 verify with anybody else whether Ms. Benitez had been

21 involved as a nanny or something similar with

22 Ms. Alanis' children?

23 A.   So we asked her if she had been employed by any

24 manner with Ms. Alanis or the owner of Manos de Oro,

25 and she indicated that she had never been employed or

1  did that type of work for any individual.

2  Q.   And as far as Ms. Benitez and some of these other

3  people, do you know what their immigration status is?

4  A.   So Mr. Pena, he's able to cross into the United

5  States, so I believe he has some sort of visa

6  permission.   Mr. De la Garza resides in the United

7  States, as well as Ms. Benitez.

8  Q.   So they're both residents, but Mr. Pena just has a

9  visa.   Do you know if that's a work visa or just --

10  A.   I do not know.

11          MR. SWARTZ:   Your Honor, I object to the

12  relevance of getting the immigration status of the

13  individuals identified.

14          THE COURT:   Okay.  Well, he's answered

15  already, so --

16  BY MR. SULLY:

17  Q.   As far as whether Mr. Pena worked as a handyman or

18  Ms. Benitez worked as a nanny, were you able to ask

19  Ms. Alanis or anybody else about that?

20  A.   No, we did not -- we did not make contact with

21  Ms. Alanis, so we did not obtain her statement in

22  regards to that information.

23  Q.   Did you try to make contact with her or you just

24  didn't make the attempt?

25  A.   We did not make the attempt.

1    Q.   And why -- did you not think it was important to

2    try to verify this information with Ms. Alanis herself

3    as the one who purportedly employed these people?

4    A.   I believe Ms. Alanis has been questioned or maybe

5    involved in some sort of litigation in the

6    investigation, so I did not make contact for those

7    reasons.

8    Q.   Okay.

9    A.   She might have.  Also, she might have had attorney

10   representation as well, but I did not make contact

11   based on the information I advised.

12   Q.   But basically, you're not sure what the reason was,

13   but you didn't attempt to contact her?

14   A.   I did not attempt to contact Ms. Alanis.

15   Q.   Okay.  The Facebook page that you talked about,

16   did you bring a copy of it with you or were you just

17   testifying from your memory of what --

18   A.   From my memory.

19   Q.   And as far as it -- I mean, it's been your

20   experience sometimes when people put things on Facebook

21   that sometimes it's a joke or not always everything

22   that's there literal as far as, you know, what they do

23   or what their employment is?

24   A.   I can't give an opinion on what other people have

25   put on their posts, other than what I just would review

1   and present that as obtained.

2   Q.   Okay.   As far as the Facebook page that you said

3   you believe is Mr. Olivares, how do you know that

4   that's his actual Facebook page and not either a

5   different person or somebody trying to -- I forgot the

6   word -- catfish or essentially copy somebody's

7   information?

8   A.   Sure.   So, reviewing the Facebook profile, there

9   are several photos of Hiram on there where he's also

10  tagged with photos of family members, as well as I

11  believe there might have been one related to a

12  baptismal or a communion of somebody.   So, if it's not

13  his and if it's someone else pretending to be his,

14  they've obtained personal information and appearing to

15  be Mr. Olivares.

16  Q.   And so the Facebook page showed, I guess, locations

17  and events that he had been at recently, for example,

18  like baptism?

19  A.   Yes, if I recall correctly.

20  Q.   Did the posts have any information about the

21  locations?   Did they pretty much continue up until his

22  arrest or did they stop at any point disclosing, you

23  know --

24  A.   They were periodically.   I mean, some of them

25  appeared to be daily and then in other instances there

1   would be breaks inbetween.  Some of the posts were

2   quotes and primarily all in Spanish.

3   Q.   But it wasn't like the page was taken down or any

4   of his location information after he was first

5   interviewed by --

6   A.   Not to my knowledge.

7   Q.   The information that you said was based on speaking

8   to, for example, Mr. Pena, Mr. Pena told you that he

9   didn't work as a handyman for Ms. Alanis, right?

10  That's how you --

11  A.   That's what he advised us, yes.

12  Q.   What evidence do you have that Mr. Olivares knew

13  that, that he didn't believe that he had actually

14  worked as a handyman?

15          MR. SWARTZ:  Objection, asked and answered.

16          THE COURT:  You can go ahead and answer if you

17  know, Special Agent Banuelos.

18          THE WITNESS:  Can you repeat the question,

19  please?

20  BY MR. SULLY:

21  Q.   Let me clarify.  For example, do you have any

22  evidence to show that Ms. Alanis didn't tell

23  Mr. Olivares that Mr. Pena worked for her as a handyman

24  and that he honestly believed that that was the case

25  even if it turned out he was mistaken?

1   A.   We had the information that Mr. Pena told us that

2   he had not provided any type of handyman work in the

3   Rio Grande Valley.  And during the time frame of the

4   pay periods that appeared on the payroll or what

5   appeared to be payroll checks of Manos de Oro to

6   Mr. Pena, he provided pay stubs from his employment in

7   Mexico, which would be a conflict or at least

8   purporting to be working at two places at the same time.

9   Q.   But did he say that Mr. Olivares knew about the pay

10  stubs in Mexico or knew that, for example, Mr. Pena

11  told Mr. Olivares, "I don't work, I've never worked for

12  Ms. Alanis"?

13          MR. SWARTZ:  Objection, asked and answered,

14  Your Honor.

15          THE COURT:  You can answer if you know.

16          THE WITNESS:  Can you repeat the question, I'm

17  sorry?  Did I know if Mr. Pena --

18  BY MR. SULLY:

19  Q.   Yeah, let me clarify.  I know I didn't ask it very

20  clearly.  At any point did Mr. Pena tell you that he

21  had told Mr. Olivares that he, in fact, did not work

22  for Ms. Alanis as a handyman or things like that?

23  A.   I don't know if he had a conversation with

24  Mr. Olivares about that, if that's what you're asking.

25  Q.   Was he ever asked by any of the agents whether he

1  informed --

2  A.   When we -- during our interview, he mentioned that

3  his interaction with Mr. Olivares was actually very

4  minimal, very rare.  When the times that he happened

5  to visit Mr. Olivares' parents at their house on South

6  Washington, if Hiram wasn't there, you know, he didn't

7  ask about him.  But if Hiram showed up, it was just

8  kind of a "hi" and that was it.  So, to that point, we

9  asked him what his interaction was with Hiram, and he

10 said it was very, very minimal.

11 Q.   Okay.  And then, for example, Ms. Benitez, was she

12 ever asked whether she told Mr. Olivares that she was

13 not in fact a nanny for Ms. Alanis' children?

14 A.   I don't recall.

15 Q.   So do you have any evidence that Mr. Olivares knew

16 that what he was telling you about him believing that

17 Mr. Pena was a handyman or Ms. Benitez was a nanny,

18 that he knew that that wasn't true, as opposed to

19 actually believing that to be the case?

20 A.   I guess that would go to the checks, that if he

21 was -- obtaining the checks from Manos de Oro and

22 giving them to -- or excuse me, depositing the checks

23 and forging their signatures to give them the money,

24 then that would indicate -- or I guess that would not

25 indicate, if anything, specifically related to that.

1   I'm not privy to what his knowledge would have been,

2   what the conversations would have been with those

3   individuals.  So I don't know that.

4   Q.  And you don't know whether Ms. Alanis told

5   Mr. Olivares that Mr. Pena and Ms. Benitez actually did

6   work for her in those capacities?

7   A.  We did not speak to her.

8   Q.  As far as the -- you said that you believe that

9   Mr. Olivares wasn't being truthful when he said that he

10  gave these people, for example, Mr. Pena and

11  Ms. Benitez, the money from the checks.  Other than

12  Mr. -- other than the people, say like Mr. Pena and

13  Ms. Benitez, do you have any evidence that they did not

14  in fact receive that cash?

15  A.  So we have their statements and then we attempted

16  to actually obtain bank statements to corroborate that,

17  because of the time frame of when this report happened,

18  retention periods of banks, either that information was

19  not provided to us because it did not exist.

20  Q.  Okay.

21  A.  We did ask the individuals also if they would be

22  able to obtain their own copies, at which they said

23  they would attempt to look for them as well.  But

24  because it had been a long period of time, they were

25  unsuccessful.

Agent Joshua Banuelos - Cross by Mr. Sully                    76

1   Q.   So you don't know how much cash was deposited into

2   their accounts during these time periods?

3   A.   We do not know that as far as a visual view of the

4   bank analysis, other than their description.  But they

5   also mentioned to us that they did not receive a single

6   dollar from Mr. Olivares at any point in time.

7   Q.   So you don't have any actual records from the bank

8   to say that either way?

9   A.   From those individuals, we do not.

10  Q.   As far as the bank, Wells Fargo, I think you said

11  something about that they expressed some concerns about

12  third party checks being deposited into the business

13  account.

14  A.   Or suspicious activity, rather.

15  Q.   Okay.  Do you know if Wells Fargo rejected any of

16  these transactions that they're now telling you that

17  they felt were suspicious or a concern?

18  A.   Yes, there was a series of deposit that

19  incorporated checks as they had previously.  Wells

20  Fargo rejected that deposit at that point.  It's my

21  understanding that they refused all deposits from that

22  point on that were from the third parties that were

23  from the individuals listed.

24  Q.   Okay.  Obviously, not any of the checks listed in

25  the Indictment, right?  Those were checks that were

```
 1  actually --
 2  A.   Those were deposited, yes, sir.
 3  Q.   -- deposited by Wells Fargo.
 4        And as far as that business account that
 5  you've been testifying about, that account is no longer
 6  in use as of today or as of recently?
 7  A.   I believe that's correct.
 8        MR. SULLY:  I'll pass the witness, Your Honor.
 9        THE COURT:  Okay.
10        MR. SWARTZ:  Your Honor, just a few follow-up
11  questions.
12        THE COURT:  Okay.
13                 REDIRECT EXAMINATION
14  BY MR. SWARTZ:
15  Q.   You were asked about the border crossings; do you
16  remember that, Agent Banuelos?
17  A.   Yes, sir.
18  Q.   And you testified that you ran a search in the
19  crossing database associated with the name, the birth
20  date of Mr. Olivares?
21  A.   Correct.
22  Q.   And you also had a plate number associated with
23  Mr. Olivares?
24  A.   We did.
25  Q.   Now, when Mr. Olivares was taken into custody,
```

1  where was he arrested?

2  A.   He was arrested at the Progreso Port of Entry.

3  Q.   And did you receive an alert from the Border Patrol

4  Officers at that port of entry basically associated

5  with Mr. Olivares?

6  A.   Yes.  When we -- we placed an alert into the

7  database and specified the two license plate numbers

8  that we had associated with Mr. Olivares.  And when the

9  vehicle was captured crossing into the United States,

10  the alert was triggered and contact was made from their

11  office to ours.

12  Q.   So the plate number you had for Mr. Olivares

13  matched Mr. Olivares on that occasion?

14  A.   It did.

15  Q.   And you were asked some questions about the owner

16  of Manos de Oro; do you recall that?

17  A.   Yes.

18  Q.   And you were asked whether you interviewed the

19  owner of Manos de Oro, Nora Alanis, in connection with

20  this investigation?

21  A.   Correct.

22  Q.   Is this investigation ongoing?

23  A.   It is.

24  Q.   Are there other investigative steps and potentially

25  other individuals that remain focuses of the

1   investigation?

2   A.   Yes.   And we're not at liberty to comment on

3   ongoing investigations tied to that.

4   Q.   You were asked about bank accounts; do you recall

5   that?

6   A.   Yes.

7   Q.   And you were asked about whether you looked at the

8   bank statements of individuals to whom the checks were

9   written and are identified in the Indictment; do you

10  recall that?

11  A.   Yes, I do.

12  Q.   Now looking at the statements, the bank

13  statements -- well, first of all, did you look at the

14  bank statements associated with Mr. Olivares?

15  A.   We did.

16  Q.   Could you see when Mr. Olivares -- or checks were

17  deposited into his account?

18  A.   We did.

19  Q.   And could you see when withdrawals were made from

20  his account?

21  A.   Yes.

22  Q.   Could you see the frequency and amount of

23  withdrawals?

24  A.   Yes.

25  Q.   Did it appear to you that the withdrawals from his

1  account matched the amount of the checks that were

2  going into his account?

3  A.   Cumulative, yes, but the initial amounts may have

4  not.  For example, if he withdrew $1500 at one branch,

5  that might not have been one of the amounts of the

6  check specifically.  But the cumulative deposit amount

7  was withdrawn over a series of withdrawals.

8  Q.   When you say cumulatively, was it the case that the

9  entire amount that was deposited in his account was

10 eventually withdrawn or spent?

11 A.   Yes.

12 Q.   Did you see instances where there was a withdrawal

13 that matched the amount of the check associated with

14 Soila Benitez, Rogelio Pena, or Jose de la Garza?

15 A.   Yes.

16 Q.   How many instances?

17 A.   Several.  I can't recall the exact amount.

18 Q.   The exact amount of the check?

19 A.   The ranges averaged anywhere from $3,000 possibly

20 up to $5,000.

21 Q.   Were there instances you identified in your

22 investigation where the withdrawals or there were

23 checks written after those deposits were made that went

24 elsewhere other than to those individuals?

25 A.   That's correct.

1  Q.   You were asked about the address of 927 Washington

2  Avenue.  Do you recall that?

3  A.   Yes.

4  Q.   Now, did you interview an individual -- you

5  testified earlier that you interviewed Jose de la Garza?

6  A.   Correct.

7  Q.   And he was married at one point to Mr. Hiram

8  Olivares' sister; is that correct?

9  A.   Yes.

10 Q.   Did Mr. De la Garza say anything about residing at

11 that address, 927 Washington?

12 A.   Yes, he said there was a period where he

13 temporarily resided there with his then wife,

14 Mr. Olivares' sister.

15 Q.   And during that time period did he say whether or

16 not Mr. Olivares was a permanent resident?

17 A.   He indicated to us that Mr. Olivares was -- he

18 would very rarely see him at that residence, and if it

19 was, it was for a very short period of time.

20 Q.   And you were asked about verifying the employment

21 of certain individuals.  Do you recall that?

22 A.   Yes, sir.

23 Q.   And with respect to Rogelio Pena, did you -- did

24 Mr. Pena provide you with records showing that he was --

25 during the time that checks were written from Manos de

 1 | Oro to him, at least to his name, did you -- did he

 2 | provide you with records showing that he was employed

 3 | elsewhere?

 4 | A.   Yes, he provided those.

 5 | Q.   Could you describe for the Court what those records

 6 | were?

 7 | A.   They were pay stubs from a university or college in

 8 | Mexico that had his identifiers there and his wages

 9 | earned for a professor, I believe, in math.

10 |         MR. SWARTZ:  Nothing further, Your Honor.

11 |         THE COURT:  Okay.  Mr. Sully, was there

12 | anything else?

13 |         MR. SULLY:  Yes, Your Honor.  I'll try to make

14 | a brief follow-up on that.  Thank you, Your Honor.

15 |         THE COURT:  Make it really brief.

16 |                    **RECROSS-EXAMINATION**

17 | **BY MR. SULLY:**

18 | Q.   So I'll try to go quickly.  Special Agent,

19 | regarding Mr. Pena, you testified that he would be at

20 | social gatherings here in the United States sometimes

21 | when Mr. Olivares was present?

22 | A.   Are you referring to Mr. Pena?

23 | Q.   Yes.

24 | A.   No, he indicated that because Mr. Pena's wife is

25 | related to Mr. Olivares' mother, that very short

1  circumstance that they may have visited their house off

2  of Washington Street.

3  Q.   Okay.  So he would be present in the United States,

4  essentially, is what --

5  A.   Yes, sir.

6  Q.   And do you know what university that he was

7  receiving pay from, where that university was located?

8  A.   I don't recall, but it was on the pay stub that we

9  do have record of.

10  Q.   Okay.  And I believe, was his status that he was a

11  resident or he had a visa?

12  A.   I believe he has a visa, but I'm not a hundred

13  percent certain on the exact status of his residency.

14  Q.   Okay.  As far as the business account, you said

15  that it was associated with a business, Mr. O's Travel?

16  A.   Yes, sir.

17  Q.   And so with -- in that account, did you see other

18  activity besides these checks that could have been

19  related to that travel agency?

20  A.   Not that I recall off of memory, but it is possible

21  in reviewing the records that there may be some.  But

22  during the interview of Mr. Olivares, he did say that

23  he had that business for -- or at least he operated it

24  full-time during this hiatus with Manos de Oro.

25  Q.   And you don't have any evidence to suggest that

Agent Joshua Banuelos - Recross by Mr. Sully                    84

 1  that's not true, that he did in fact operate that?

 2  A.   No.

 3  Q.   As far as the -- to clarify, when you said the

 4  cumulative amounts matched, so essentially whatever

 5  money was coming in from the checks was coming out?

 6  A.   That's correct.

 7  Q.   Oh, okay.  So it wasn't just staying in the account

 8  and not getting withdrawn?

 9  A.   No, it's either through cash withdrawals, ATM

10  withdrawals, or debit card purchases.

11  Q.   As far as when Mr. Olivares was arrested, did he

12  resist arrest in any way?

13  A.   No, sir.

14  Q.   Did he have any weapons or contraband?

15  A.   No.

16  Q.   Was he disrespectful or uncooperative with you?

17  A.   No, sir.

18          MR. SULLY:  I pass the witness, Your Honor.

19          MR. SWARTZ:  Nothing further, Your Honor.

20          THE COURT:  Just one quick thing.  You peaked

21  my interest -- Mr. Sully did with that last question.

22  What kind of debt card purchases were --

23          THE WITNESS:  They varied at restaurants,

24  retail stores.  There was a couple in Las Vegas as well,

25  and gas purchases, personal expenses.

1          THE COURT:  And those were coming out of the

2    same money that was being deposited, as far as you

3    could tell?

4          THE WITNESS:  As far as I could tell, yes, sir.

5          THE COURT:  Okay.  All right, thank you, sir.

6              Mr. Swartz, does the Government wish to

7    present any other evidence?

8          MR. SWARTZ:  No other evidence, just argument,

9    Your Honor.

10          THE COURT:  And before hearing the

11   Government's argument further, Mr. Sully, did you -- of

12   course, as I mentioned already, I'll take notice of the

13   Pretrial Services Report and the information there.

14   Was there other evidence you wish to present?

15          MR. SULLY:  No, Your Honor, we would just have

16   an argument response.

17          THE COURT:  Okay.  So you can go ahead,

18   Mr. Swartz.

19          MR. SWARTZ:  Thank you, Your Honor.  Your

20   Honor, 18 U.S.C. 3142(g) basically lists three factors

21   that require the Court to weigh when considering whether

22   there are conditions of release that would reasonably

23   assure the appearance of Mr. Olivares at future

24   appearances.  And in this case each factor weighs in

25   favor of detention.

1          The first factor, nature and circumstances

2 of offense charged.  The Indictment is 23 counts, 21

3 counts of bank fraud.  18 U.S.C., Section 1344, which

4 has a maximum penalty of 30 years imprisonment.  And

5 one count of money laundering conspiracy, which is 18

6 U.S.C., Section 1956, which has a maximum up to 20

7 years imprisonment.  One count of false statements

8 under 18 U.S.C. 1001, which has a maximum term of

9 imprisonment of five years.  These are serious charges

10 and they could potentially result in a lengthy prison

11 sentence if Mr. Olivares is found guilty.  So the first

12 factor, the nature and circumstances of the offense

13 charged, would weigh in favor of detention.

14          The next factor, the weight of the

15 evidence.  The Court here heard in significant detail

16 from Agent Banuelos.  The Grand Jury in this  case was

17 presented with the Indictment.  They found probable

18 cause for each of the counts in the Indictment.  Agent

19 Banuelos gave the Court some content and a flavor of the

20 evidence.  If I could state the evidence, the evidence

21 against Mr. Olivares is significant.

22          So Agent Banuelos testified that during

23 the time period of the bank fraud charges, over a

24 hundred checks were deposited into Mr. Olivares' bank

25 account at Wells Fargo, and those checks were

1   purportedly issued from Manos de Oro to three

2   individuals, and each of those individuals were

3   contacted by agents and they said, "I never worked for

4   Manos de Oro, never received these checks, the

5   signature on the checks and the endorsement is not

6   mine."

7            And looking at just the example of

8   Mr. Rogelio Pena, Mr. Rogelio Pena, as Agent Banuelos

9   testified, is a math or business teacher at a

10  university in Mexico.  During the time period in which

11  checks were being found in his name into Mr. Olivares'

12  bank account, Mr. Pena provided pay stubs showing that

13  he was employed as a professor in Mexico.  And so he

14  was not employed and he verified what he said from his

15  pay stubs.  He was not employed at Manos de Oro.

16            He also indicated that Mr. Olivares had

17  approached his wife and indicated that Mr. Olivares

18  worked for the U.S. Government and said he could verify

19  his Social Security number.  And that information is

20  verified in looking at the Facebook post of

21  Mr. Olivares' account.  As Special Agent Banuelos

22  testified, the Facebook account lists as employer the

23  U.S. Government.  So Mr. Pena, he was basically

24  deceived -- or his wife was deceived in turning over

25  his personal information, his Social Security number.

1  Checks were written in his name, at a time he was
2  employed elsewhere outside the country, and deposited
3  into Mr. Olivares' bank account.

4           The money laundering conspiracy charge,
5  as Special Agent Banuelos testified, Mr. Olivares
6  approached an individual that was known to be a drug
7  trafficker.  But Mr. Olivares' good friend, Esmeralda
8  Trevino, admitted to Special Agent Banuelos that she
9  knew that her son-in-law, Virgil Carillo, was a drug
10 trafficker.  She knew that his family was involved in
11 drug trafficking.  But Mr. Olivares approached a known
12 drug trafficker and offered a proposition:  "I'll help
13 you clean your money in exchange for cash."  And so it
14 began where Mr. Olivares would provide a check to
15 Mr. Carillo, purportedly a payroll check from Manos de
16 Oro to Mr. Carillo, and then Mr. Carillo would take the
17 check and exchange it with Mr. Olivares for cash.

18          Mr. Carillo -- the company, Manos de Oro,
19 was subpoenaed and asked for phone records associated
20 with Mr. Carillo.  They provided nothing.  Employees
21 who worked there during that time period were
22 approached by agents and were interviewed.  They were
23 shown a picture of Mr. Carillo and asked, "Do you know
24 Mr. Carillo?  Did he ever work at Manos de Oro?"

25          They said, "We don't recognize the

1   picture.  We don't know him."

2               The only person that said that they

3   recognized Mr. Carillo and supported the assertion

4   that he worked there was his mother-in-law, Esmeralda

5   Trevino.  Checks were also issued to her in her name

6   and deposited into Mr. Olivares' bank account, and she

7   shared a bank account with Mr. Olivares.

8               Other facts, the Indictment charges false

9   statements.  So Mr. Olivares met at the U.S. Attorney's

10  Office.  He had counsel present.  He signed a document

11  that emphasized the importance of telling the truth

12  and the fact that if you lie, materially provide false

13  statements, you can be prosecuted under 18 U.S.C. 1001.

14  Even with that, even with counsel present, he proceeded

15  to lie repeatedly.

16              So the weight of the evidence in addition

17  to the probable cause found by the Grand Jury to return

18  an Indictment supports detention in this case.

19              So the final factor is the history and

20  characteristics of the person.  There is no question

21  that Mr. Olivares has strong ties to Mexico.  He was

22  born in Mexico, he lived in Mexico for the first 15

23  years of his life.  He's only been a United States

24  citizen for five years.  He has family in Mexico.

25              And investigators have had a difficult

1  time identifying the current residence for Mr. Olivares.

2  The only residence that Mr. Olivares provided was the

3  Washington address, the address of his parents.  But

4  one of the witnesses, Jose de la Garza, who lived there

5  at that address for a period of time, said he didn't

6  see Hiram Olivares there.  Investigators were not able

7  to connect Mr. Olivares to that address.

8         Mr. Olivares, there was another address

9  associated with him and his cell phone.  When agents

10  went to that address, the person at that address knew

11  Mr. Olivares, but was surprised that that address was

12  associated with his cell phone.

13         So the two addresses the agents were able

14  to locate for Mr. Olivares, there's no -- the evidence

15  that agents received from other individuals did not

16  corroborate that he actually lived at those addresses.

17         Now, Mr. Olivares spends a significant

18  amount of time in Mexico.  When agents approached

19  Mr. Olivares' father, Mr. Olivares' father said that he

20  stays at that house on 927 Washington occasionally and

21  he spends time in Mexico.  The border crossings that

22  Agent Banuelos testified to showed that he goes back

23  and forth between Mexico with incredible frequency,

24  sometimes multiple times per day, and just the border

25  crossings themselves raise a number of red flags.

 1  Agent Banuelos testified that in the year preceding

 2  his indictment in this case he crossed into the United

 3  States, he entered in over 240 times.  And he said that

 4  sometimes he would enter the United States multiple

 5  times on the same day.  In at least one instance he

 6  entered the United States three times on the same day

 7  and he used different ports of entry each time he

 8  entered the United States on that occasion.

 9        So the number of crossings would not be

10  unusual if you're commuting back and forth for work,

11  but the timing of the crossings are inconsistent with

12  commuting for work.  Those crossings, as Agent Banuelos

13  testified, were between the hours of sort of midnight

14  and 2:00 a.m., very early morning, sort of what you

15  don't expect for a commuter crossing.

16        There's also in this case, in terms of the

17  history and characteristics of the person, in case law

18  looking at the factors, Courts often point to deception

19  on being a factor that weighs in favor of detention.

20  In this case there is enormous evidence of deception on

21  the part of Mr. Olivares.  As I mentioned earlier, he

22  deceived Mr. Pena's wife into turning over Mr. Pena's

23  Social Security number by saying he was a

24  representative of the U.S. Government.  He deceived

25  Wells Fargo Bank by depositing checks that were made

1  out to bank employees and with forged signatures over a

2  hundred times just for those three individuals.

3         Then when he was interviewed by Federal

4  Agents, he lied repeatedly.  And Agent Banuelos

5  testified that he lied about very material things in

6  the investigation.  He lied about whether these

7  individuals worked for Nora Alanis or worked for Manos

8  de Oro.  He lied about whether he gave the cash to

9  those individuals.

10         In the Pretrial Services Report, the

11  information provided by Mr. Olivares, there was a

12  suggestion in there that the frequent crossings relate

13  to a sick relative in Mexico, and that information was

14  reportedly corroborated by Dora Olivares.  But as Agent

15  Banuelos testified, Dora Olivares is implicated in this

16  scheme.  Checks in her name were also deposited into

17  Mr. Olivares' bank account.  Agents tried to locate and

18  interview her unsuccessfully.

19         So Hiram Olivares, who has a history of

20  deception, and Dora Olivares, who is implicated in

21  this scheme, are the only individuals that provided

22  information to Pretrial Services.  So the explanation

23  about he's traveling back and forth to care for a sick

24  relative really is not credible because the sources are

25  not credible.  And within the context of this case,

 1  within the context of assisting drug traffickers with

 2  money laundering, with depositing fake payroll checks

 3  into bank accounts, the frequency and the nature of

 4  those crossings is concerning and alarming, and that

 5  weighs in favor of detention.

 6              So the history and characteristics,

 7  defendant's lack of verifiable address, the frequent

 8  unusual border crossings, the pattern of deception all

 9  weigh in favor of detention in this case.  So the

10  Government has shown that each of those three factors

11  weigh in favor of detention.  The Government has shown

12  by a preponderance of the evidence that Hiram Olivares

13  is a flight risk and there's no condition or

14  combination of conditions that would reasonably assure

15  his appearance at future proceedings, and that's the

16  basis for which the Government moves that he be

17  detained pending trial.

18              Thank you, Your Honor.

19          THE COURT:  Okay, thank you.

20              Mr. Sully.

21          MR. SULLY:  Your Honor, let's just start with

22  the characteristics of Mr. Olivares.  As the Court

23  knows, he's a U.S. Citizen.  There's obviously not any

24  immigration consequences to any of these charges.  He's

25  lived in the United States almost all his life, for the

1  last 27 years.  I know the Pretrial Services Report

2  says 20 years, but when I was doing the math based on

3  his age and when he moved here, I believe it's actually

4  27, but the point is it's been a long time.

5            He's worked in the area.  He has a long,

6  consistent employment history.  He's currently

7  employed.  If he's released, he'll be able to return to

8  that job.  And he's also been educated here.  His

9  family ties are here.  Both of his parents reside in

10  the U.S.  They're also U.S. Citizens along with his

11  siblings.  They're here present to support him.

12  They're willing to assist the Court in any way the

13  Court may need, whether it's third-party custodian or

14  anything else that the Court may ask.

15            And Mr. Olivares has no criminal history.

16  And the allegations, other than the ones regarding his

17  recent interview, are all pretty remote.  I believe the

18  last transaction that's listed in the bank fraud count

19  is from 2013, so about six years ago.  And with the

20  Count 22, it doesn't specifically list the basic

21  transactions, but it indicates early 2014, so that

22  would also be about five years ago.  So even the

23  alleged criminal conduct is pretty remote and there's

24  no allegation other than concerning the interview that

25  he's engaged in any other criminal activity besides

1   what's listed in the Indictment.

2            He's, of course, presumed innocent.  At

3   this stage of proceedings there is actually a

4   presumption in favor of release that comes along with

5   that, Your Honor.  Nothing about the nature of what

6   he's charged with indicates a risk of flight.  He's not

7   charged with escape.  He's not charged with any kind of

8   offense that involves dangerousness to the community.

9   They are essentially white collar type offenses, most

10  of which are pretty remote.

11            But what I would like to draw the Court's

12  focus on is the fact that Mr. Olivares was first

13  interviewed -- not just contacted but actually

14  interviewed by Government Agents back in January of

15  this year, so almost five months ago.  And he's -- the

16  information he provided was truthful.  At least, he's

17  not being charged with having given false statements

18  during that interview.

19            But more importantly, Your Honor, it shows

20  the fact that as early as January he knew that he was

21  somehow involved in a federal investigation, whether as

22  a subject or a target or in some way he was being

23  investigated.  Somebody who presents a flight risk

24  would not stick around.  If they had the ability and

25  inclination to flee to Mexico, for example, he would

1  already be in Mexico.  But he -- not only did he stick

2  around, but he submitted to a subsequent interview

3  with the agents in March.  And then he again was asked

4  questions regarding his activities.  And again being

5  reminded that he is implicated in an investigation, he

6  still stuck around.  Regardless of whether he went to

7  Mexico and came back, he always came back.  He never

8  left for an extended period or otherwise tried to flee.

9  There is no evidence that he changed his travel

10  patterns, that he changed his residence, that he

11  changed employment, that he did anything to try to hide

12  from the Government or to try to flee even after this

13  period that he was at least the subject of an

14  investigation.

15           As far as the crossings, the agent's

16  testimony was that they were associated with a

17  particular vehicle or vehicles.  I think he said that

18  there were two license plates.  And obviously, they

19  knew that Mr. Olivares was in the vehicle the day he

20  was arrested because he was arrested at the bridge and

21  he obviously came back into the United States, didn't

22  try to stay in Mexico knowing that he was a subject of

23  investigation.

24           But as far as all the other crossings,

25  other than the fact that they don't show any change in

1  travel patterns after he was contacted by the

2  Government, the agent testified that they can't be

3  personally linked to Mr. Olivares.  So we don't know

4  how many of those are actually Mr. Olivares versus

5  somebody else that he may have loaned the car to.  So

6  we can't really draw any conclusions from all of those

7  crossings.

8           But as far as his characteristics, Your

9  Honor, and especially his behavior, his lack of any

10 attempt to hide from the Government even after it

11 became abundantly clear that he was under investigation

12 and might get charged for what he was being

13 investigated about show that he does not -- he is not a

14 risk of flight and there are conditions that can secure

15 his appearance at future court proceedings.

16          As far as the actual offense he's charged

17 with, or offenses, the weight of the evidence, I don't

18 want to take up too much of the Court's time with every

19 single detail since this isn't a trial, but what I do

20 want to point out is that the evidence isn't as strong

21 as it is in some other cases.  For example, with the

22 false statements charge, the gist of the charge seems

23 to be that Mr. Olivares says one thing.  They talk to

24 somebody else and they say another thing.  There's no

25 documents or objective evidence to show who's telling

1   the truth and the Government believes the other person

2   over Mr. Olivares, when it's possible that other people

3   could be not telling the truth.  Especially, for

4   example, Mr. Carillo indicated that he made statements

5   while his drug case was pending and obviously would

6   have an incentive to maybe not be fully truthful under

7   those circumstances.

8            But the agent testified that they

9   haven't -- for whatever reason, they don't have the

10  bank statements of these people to see if they actually

11  did receive the cash or not.  They don't have the

12  income tax information to see if they were actually

13  earning this income or not.  Most importantly, they

14  haven't spoken to the actual owner, the actual employer

15  of these people during that time to see if she employed

16  them or not.

17           And I think there's an important

18  distinction to be made that not all of these are

19  alleged to be actual employees of the Manos de Oro

20  company.  Some of them -- the indication was that

21  Mr. Olivares told the agents that he believed, for

22  example, that Mr. Pena had done some handyman services

23  for Ms. Alanis and that that's why he believed that

24  Ms. Alanis was issuing these checks out to Mr. Pena.

25           And the point isn't so much as to whether

1   or not that's actually true.  The fact that Mr. Pena

2   may be employed as a professor in Mexico doesn't mean

3   that he couldn't have done handyman services whenever

4   he was present in the United States whenever he was

5   with Ms. Alanis.  The evidence that's missing, Your

6   Honor, is any evidence that Mr. Olivares actually

7   believed that statement to be untrue.  He could have

8   honestly been mistaken or Ms. Alanis could have told

9   him, "Oh, yes, you know, Mr. Pena does, you know, work

10  for me around the house."  He relates that to agents.

11           Whether or not it turns out to be true or

12  not, there's no evidence that he intentionally was

13  trying to mis-relay them as opposed to just relaying

14  what he had heard from Ms. Alanis or other sources.

15  And so far that hasn't been corroborated.  The

16  Government said, "Well, this is an ongoing

17  investigation, we're still looking into things."  And

18  that's one of the things that at this point they

19  haven't been able to show the Court whether he actually

20  knew that to be true or not and whether he was actually

21  trying to mislead the agents.

22           The same thing as far as the checks.

23  There was evidence regarding that somebody else may

24  have known or believed that Mr. Carillo was a drug

25  dealer.  There was no evidence that Mr. Olivares

1  himself would have known or suspected that Mr. Carillo

2  was a drug dealer at the time before he was arrested.

3            And as far as the actual checks, as I

4  said, other than the people's statements which the

5  Government is taking as Gospel and assuming that

6  Mr. Olivares is not telling the truth, they don't have

7  any objective evidence to show who was telling the

8  truth or not.  But again, this isn't a trial.  We'd

9  just point out that he is presumed innocent of those

10 charges.  They are remote, with transactions occurring

11 about six years ago.  But more importantly, we do

12 believe that conditions can be set.

13            Specifically, as far as what conditions

14 can be set, Pretrial Services has recommended some

15 conditions.  We feel that those are more than adequate.

16 The only one that may present a challenge is regarding

17 the co-surety.  Mr. Olivares' parents and sibling are

18 willing to be co-suretors.  However, their asset is

19 basically their homestead, and so I don't know if that

20 would be -- it might be a problem.  Otherwise, they are

21 citizens, they don't have criminal history.  So, if

22 the Court were to allow them to sign on a bond with

23 Mr. Olivares, they would be more than willing to.

24            But what we would ask the Court, if the

25 Court does set release conditions, would be to

1  consider, perhaps instead of having a third party

2  custodian, allowing one or more people to assure

3  Mr. Olivares' appearance and compliance with conditions

4  even if perhaps they don't have independent assets with

5  their homestead to equal the bond amount.

6             And we would also point out to the Court

7  that while we feel these conditions are adequate, the

8  Court is, of course, able to impose additional

9  conditions if it sees fit.  Mr. Olivares would be

10 willing to submit to home detention with a GPS monitor,

11 for example.  That would address the concern of whether

12 or not he's actually going to be at the parents'

13 address so the Court could monitor it that way, could

14 put all the way up to home detention to where he can

15 only leave for employment and otherwise be at home.

16 The Court could raise the bond amount and raise the

17 deposit amount from what's been suggested by Pretrial

18 Services if it feels necessary.

19            As far as the other conditions, if the

20 Court does set conditions, the only other request or

21 thing I would point out is that Mr. Olivares'

22 employment generally requires him to travel and start

23 in Cameron County and sometimes to the Falfurrias area.

24 So, if he were released, then he would like to be able

25 to travel to those areas.  But if the Court wishes to

 1   restrict him more narrowly, say just to Hidalgo or

 2   Starr or Cameron Counties, then we would of course

 3   defer to whatever conditions the Court may set.

 4            But given all of his characteristics and

 5   especially the fact that he not only did not make any

 6   attempts to flee, but continued to make himself

 7   available to agents and to the Government even after

 8   it became obvious that he was under investigation and

 9   could eventually be charged, we believe it all point to

10   the fact that there are conditions that can be set to

11   ensure the appearance at future court proceedings, Your

12   Honor.

13            THE COURT:  Okay, thank you.

14            In determining bond, I'm required to apply

15   the factors under the Bail Reform Act and both counsel

16   referred to those.  I'm just going to make some brief

17   findings on the record regarding factors.  I'll just

18   note that I do take into account, as I mentioned

19   earlier, the information set out in the Pretrial

20   Services Report, so I am considering all that as well

21   as the Indictment, the allegations there, and the

22   testimony of Special Agent Banuelos.  And so I'm

23   considering all those things so that even if I don't

24   mention some aspect of this, I've taken that into

25   account.

 1              As far as the first factor, the

 2   seriousness of the -- nature and seriousness of the

 3   alleged offense, in this case the defendant,

 4   Mr. Olivares, does face a number of different charges.

 5   As Mr. Swartz pointed out, there are significant

 6   penalties attached to those, and so I think -- well,

 7   first, I do find that, you know, that these are serious

 8   charges and brought here in federal court, they are

 9   felonies, and carry significant penalties.  So that is

10   a significant factor here as far as the nature and

11   extent of the criminal conduct that's being alleged.

12   I also note, as Mr. Sully pointed out and it's

13   important we have to keep in mind, that Mr. Olivares is

14   presumed to be innocent.  You know, these findings are

15   all related to the information  before the Court for

16   purposes of this bond determination.  But none of these

17   findings affect the fact that Mr. Olivares is presumed

18   innocent at this point.

19              As far as the weight of the evidence, I

20   do find there is significant evidence based on the

21   testimony of Special Agent Banuelos.  And in fact, the

22   Indictment itself, the detail of the allegations set

23   out in the Indictment would tend to support that as

24   well.  That's not to say there are not arguments that

25   can be made as to many of the allegations.  Maybe

1  something can be argued about all of them.  And

2  Mr. Sully has already suggested arguments that can be

3  raised, and I'm sure they will be raised as the case

4  goes forward.  But the overall evidence, the number of

5  different instruments that were deposited, just the

6  nature of these transactions is -- you know, there may

7  be an innocent explanation, but it seems like, you

8  know, that would be a stretch here to say the least.

9           You know, I'm not saying or predicting

10 what will happen, the outcome of the case, but I am

11 saying that for purposes of the bond determination, the

12 evidence at this point appears to be significant.  And,

13 you know, it reflects a pattern of fraudulent activity

14 that, you know, appears to be the type of activity that

15 may be related to other types of crimes.  And so I just

16 note that about this.  Again, there may be some

17 arguments that can be made as to various aspects of

18 this, but there would be a lot to overcome here as far

19 as the evidence that, you know, the Government has at

20 this point.

21          As far as the personal circumstances and

22 characteristics of the defendant, I think both counsel

23 have argued their side of that well.  I think that

24 the -- as far as Mr. Olivares' personal circumstances

25 and characteristics, really, the arguments of the

1  Government as well as defense counsel are supported by

2  things that you can -- the facts that you can point to.

3           On the positive side, as far as ties that

4  would be helpful in terms of the Court setting

5  conditions of release for Mr. Olivares, he is a United

6  States Citizen.  I mean, he's a rather recently

7  naturalized United States Citizen.

8           Of course, I hope that the allegations

9  against him prove to be unfounded or a big mistake

10 because it's depressing to think that Mr. Olivares was

11 naturalized as a United States Citizen right around the

12 time he's committing what would be serious federal

13 felony offenses.  So I hope that something clears that

14 up.  But, in any event, he is a United States Citizen.

15 He does have significant ties in the United States.

16 He's been here a number of years, at least 20, and it

17 seems like maybe longer than that since he appears to

18 have been here since he was 15 in the United States.

19 And so his parents are here.  He's got his -- I can't

20 remember.  I know that at least he has his sister here.

21 And so his ties have been here for some time in the

22 United States.  He's had employment in the United

23 States over a number of years.

24           Very significantly, Mr. Olivares does not

25 have any criminal history at all.  There's not even a

 1  record of any type of arrest or traffic stop or

 2  something like that.  Or traffic stops wouldn't appear

 3  here anyway, but it is a positive circumstance.  He

 4  doesn't have any criminal history.

 5            So those are all positive things that the

 6  Court takes into account in determining whether

 7  conditions of release can be set.

 8            At the same time, there are also

 9  circumstances that give cause for concern, and I think

10  Mr. Swartz pointed those out very well.  Mr. Olivares,

11  like many people in this area, in addition to having

12  strong ties in the United States, he also has strong

13  ties in Mexico.  So, you know, that by itself is

14  certainly not a bad thing.  As I mentioned, you know,

15  fairly often in these cases the reason it's an issue

16  at this point and a reason that we talk about it in

17  connection with someone charged with crimes, especially

18  here in Federal Court, that carry significant penalties,

19  is that if someone has somewhere else that they can go

20  and are comfortable to avoid charges that may result in

21  a significant period of imprisonment, if there is a

22  conviction, then that's something that we have to take

23  into account as far as whether a person is likely to

24  appear.

25            So, you know, in that context,

1 Mr. Olivares is obviously perfectly comfortable in

2 Mexico.  He spent the first 15 years of his life there.

3 He goes there frequently, now travels there frequently.

4 Again, there's nothing wrong with a person going back

5 and forth into Mexico.  And, you know, in other

6 circumstances that's a nice thing.  But in this context

7 it's a factor to be taken into account.

8             Part of his explanation, I guess, to

9 Pretrial was that he was caring for a maternal

10 grandmother's sister.  As far as the number of --

11 although he indicated he also goes there for his own

12 medical treatment, which again is something that people

13 in this area do often for economic reasons.

14             So he does have strong ties in Mexico and

15 travels there frequently as reflected by the crossing

16 patterns.  And I don't know if Mr. Sully was trying to

17 suggest that maybe it wasn't always Mr. Olivares in

18 the vehicle that had his license plates, but I mean,

19 Mr. Olivares and his family acknowledged that he

20 travels into Mexico frequently.  So I think that's just

21 a circumstance we have here.

22             So, in looking at all the factors,

23 ultimately, the determination as to whether there are

24 conditions that would reasonably assure the person's

25 appearance at future court appearances and also

1    reasonably assure the safety of the community, I don't

2    think there's an issue as far as safety of the

3    community really here, at least not one that -- I think

4    that's something that certainly could be addressed by

5    conditions.  And really, the nature of the alleged

6    offenses here are not that type of activity, at least

7    not directly, that would give rise to those concerns as

8    far as community safety.  There is certainly a concern

9    with regard to fraud and money laundering and those

10   types of issues, but the main issue here is whether

11   there are conditions that would reasonably assure the

12   appearance of the defendant.

13           And on that, I do conclude that in this

14   case there are conditions that may be able to be set

15   that would reasonably assure Mr. Olivares' appearance

16   at future proceedings.  I do believe, though, that

17   different and additional conditions would be necessary

18   to really reasonably assure his appearance, and so I am

19   going to modify the conditions recommended by Pretrial

20   Services in a couple of respects.

21           First of all, with regard to the bond,

22   given the situation here, given the amounts that were

23   involved, this was dating back some years.  But at the

24   same time, given that activity and given the potential

25   penalties and Mr. Olivares' significant ties in Mexico,

1  I do find -- and given also that there's certainly

2  allegations of fraud and deception that are being made

3  here and some of the circumstances do, you know, give

4  pause as far as the Court being assured that he would

5  comply with conditions of release, and so that's one of

6  the reasons why I think that some other conditions

7  would be needed.

8              And with regard to the bond, I'm going to

9  set the bond at a $100,000 bond with a 10 percent

10  deposit.  Even that, I mean, that's not a huge amount

11  by any means, but at the same time, it may be something

12  that might be difficult here with Mr. Olivares and his

13  family's situation.  I'm also going to require that at

14  least one co-surer sign with him.  And this would need

15  to be a situation where there's actual security, at

16  least a significant amount, that would help secure the

17  bond.  In this case, you know, sometimes we have a

18  co-surer to sign that would be more of a responsible

19  person that may or may not have assets up to the amount

20  of the bond, but in this case I do find that there

21  needs to be significant actual security that would be

22  available.  You know, hopefully, there are family or

23  extended family or others that may be appropriate to

24  assist with that in terms of -- and I'm not setting

25  this in order to have it result in Mr. Olivares'

1  detention.  In fact, you know, I'd just enter order a

2  detention if that was the case.  But I do at the same

3  time feel that there needs to be significant security

4  here, and so that will be the bond condition.

5               As far as Mr. Olivares, sir, if you are

6  able to meet the bond and are released on that bond,

7  essentially, sir, just so you're aware, no one will

8  lose anything on the bond as long as you make all your

9  court appearances and take care of this.  Any money

10 that's deposited with the Court in this case -- I've

11 set the deposit at $10,000 -- that money would be

12 returned in full to whoever deposits that as long as

13 you make your court appearances and take care of this.

14 The remaining amount of the bond, no one would have any

15 obligation on that so long, again, as you take care of

16 this and appear in court.  If you were to fail to

17 appear, the amount of the deposit would be

18 automatically forfeited.  The remaining amount would be

19 forfeitable against any property that you may have now

20 or obtain later, but also, perhaps more significantly,

21 whoever signs with you, any property they might have,

22 whether it be land or vehicles or furniture or whatever

23 the case may be.

24               Sir, it's very important to be careful to

25 comply with all the conditions.  I'm going to explain,

1   if you violate any conditions, that could result and

2   it's likely it would result in your having to appear

3   before the District Court Judge.  Your bond could be

4   revoked.  It could have other negative consequences as

5   far as the outcome of your case here.

6            I am going to -- there's a standard

7   condition that will be set here, and that is that you

8   would need to report to Federal Pretrial Services.

9   That would be a Federal Probation Officer.  You just

10  need to follow their instructions on how to report and

11  how often to do that, sir.

12           It is a condition that you try to seek

13  and -- that you seek and maintain employment.  I have

14  noted that, and one of the things I've taken into

15  account, it appears that Mr. Olivares has had a pretty

16  consistent employment record including that he's been

17  employed over the last eight months with a particular

18  employer.  And one of the things I am going to require

19  as a condition is just that we have confirmation from

20  his employer as far as, you know, that he is employed

21  there and he has been working there and to have that

22  confirmation before Mr. Olivares' release.  Hopefully,

23  he would be able to continue with his employment while

24  he's on release.  But if for some reason that

25  employment was not available, then it would be -- a

1   condition would be that he try to seek other employment.

2              You will need to restrict your travel and

3   remain within the -- I'm going to say, as far as the

4   travel restriction, it will be Starr and Hidalgo

5   County.  I gather that those are the areas where you

6   need to travel for work, Mr. Olivares, so we want you

7   to be working if you're able to do that.  If there's

8   some need to travel outside that area for work, then

9   your attorney could move to amend that and we can

10  consider that.

11             As far as the travel restriction, though,

12  I'm going to impose an additional, more significant

13  restriction that will kind of overshadow, as far as

14  those counties, the travel restriction.  I am going to

15  impose a condition of home confinement with GPS

16  monitoring.  And the reason for that is just so we want

17  to be sure that, you know, given Mr. Olivares' travel,

18  that he does remain.  It's a condition, sir, that you

19  remain within those areas and within the United States

20  while your case is pending.  And this condition is

21  meant to just ensure that he is residing at the place

22  of residence that's indicated here.  Of course, it's

23  not a condition that really prevents somebody from

24  actually leaving, I recognize that, but at least it

25  would be a condition here I think that would be

1  appropriate and necessary to be sure that it's clear

2  where Mr. Olivares is residing and that he's not

3  traveling in areas where he shouldn't be as far as

4  while this case is pending.

5         If you have a passport, you do need to

6  surrender that.  That will be returned.  The probation

7  officer will hang onto that and return that when your

8  case is resolved.  It is a condition you not apply for

9  any passport or travel papers.

10         And other than -- so Pretrial Services,

11  the probation officer, they will be able to excuse

12  absences for work or medical needs or things like that,

13  sir.  Otherwise, you -- and even the absences that are

14  excused or authorized, you need to be careful.  As far

15  as the GPS monitoring, they will be able to know, you

16  know, where you are and so forth, so it's important to

17  be where -- the places where you should be.  So please

18  be careful about that.  Again, that's one of those

19  things, if you violate the travel condition there, it

20  could result in your bond being revoked or other

21  negative consequences for your case here.

22         Sir, it is a condition that you not

23  possess any firearm or dangerous weapon.  I'm not aware

24  of any firearms that might be located at your residence

25  or your parents' residence, but if they do happen to

1    have a hunting rifle or a handgun or anything, those

2    would need to be removed and placed somewhere where you

3    could not obtain possession of them while your case is

4    pending.

5              It is a condition that you need to submit

6    to a mental health evaluation or counseling or

7    treatment as directed by the probation officer.  That

8    would be intended to assist you, sir, and so I'd just

9    urge you to take advantage of that.  But you would also

10   need to participate in anything like that as far as

11   your conditions of release.

12             If you have any contact with a law

13   enforcement officer for any reason, you need to just

14   explain whatever that is to Pretrial Services.  Even if

15   it's a traffic stop that doesn't result in any ticket,

16   you just need to describe whatever contact you may have

17   had with a law enforcement officer.

18             It is a standard condition that not have

19   contact, directly or indirectly, with any co-defendant

20   or any potential witness or anyone else who may have

21   some involvement in connection with the charge being

22   brought against you.  And, sir, one of the reasons for

23   that is that if you're in contact with someone who has

24   some connection to this, it might make it appear that

25   you're involved with something else related to this,

1   which may make it more difficult for you to resolve

2   your case and have an effect on any sentence.  So, sir,

3   you do need to avoid contact, directly or indirectly,

4   with anyone in those categories I just mentioned.  And

5   what I mean by "indirectly" is that you can't send or

6   receive a message through another person, you can't

7   text anybody or have any contact electronically --

8   instant message, Facebook, any other way you can think

9   of -- with anyone in those categories that I mentioned.

10          Having said that, your attorney will be

11   able to contact people for you and interview people for

12   you to assist you in your defense, as appropriate.  So

13   that certainly can be done as far as, you know, being

14   able to defend yourself in this case.  But you should

15   not be in contact with anyone like that.

16          Your sister was mentioned.  I'm not going

17   to tell you you can't speak with her, but you should

18   not discuss the circumstances of the case with her.

19   You know, your attorney can work with her for you, on

20   your behalf.  But obviously, living there at the same

21   residence and being your sister, I'm not going to say

22   you can't speak with her.  But as far as anyone else is

23   concerned, you shouldn't have, again, any contact or

24   communication directly or indirectly.

25          I believe that may be about it as far as

1   conditions.  And if I forgot any, the standard

2   conditions would apply here that go along with these

3   things.

4             And so, Mr. Sully, again, this is a case

5   where I do feel that based on the circumstances, we

6   would need to have some security, and it sounded like

7   from what you said earlier that that might not be

8   available now.  And so, you know, after reasonable

9   effort, if there is no way to meet that condition, you

10  could file a motion to request that that be amended

11  and at that point, you know, we would have to consider

12  whether there are other conditions that would

13  reasonably assure the appearance of Mr. Olivares or,

14  you know, whether -- or not, I guess, basically.  And

15  so I note that.

16            And also, as far as that security goes, I

17  appreciate that Mr. Olivares' sister is willing to --

18  you know, wants to help her brother, which is certainly

19  a good thing and a nice circumstance.  But, you know,

20  there was some testimony about, you know, her coming

21  up in connection with some of the facts here.  I'm not

22  suggesting, you know, anything about that as far as

23  implying her involvement or something like that, but it

24  appears that, you know, one way or another, she may be

25  connected to this as far at least factually.  And so I

 1  think that as far as any kind of co-suretor or

 2  something, we'd be better not to try to rely on her

 3  given that circumstance.  But otherwise, the Government

 4  has the right to -- as far as the security to be aware

 5  of what's being presented for that, if you're

 6  requesting that, Mr. Swartz?

 7          MR. SWARTZ:  Yes, Your Honor.  I think Your

 8  Honor has adopted the point that I was going to make

 9  partially with respect to Mr. Olivares' sister being a

10  co-suretor, or not being appropriate as a co-suretor.

11          There was at least one other individual

12  mentioned in  the testimony of Special Agent Banuelos:

13  Esmeralda Trevino, who is an associate of Mr. Olivares

14  and at least at some point shared a bank account

15  together.  She also was implicated.  She's the mother

16  of Mr. Carillo.  I would ask, I think with respect to

17  her, that she would not be an appropriate co-surety.

18          There are other individuals sort of

19  associated.  And the Government would request that if

20  there is a co-suretor, that they not be somebody who's

21  implicated in the scheme that's at the center of the

22  investigation.

23          THE COURT:  Okay.  I mean, I think that's

24  certainly appropriate and that's what we would do in

25  any case, really.  In any case, if it turns out that,

1  you know, the co-suretor might be a witness, even, or

2  linked somehow, that it's just better not to get into

3  that situation.

4              Okay.  So, with that, thank you both.  I

5  think Mr. Sully and Mr. Swartz, both of you did an

6  excellent job in arguing for your clients here and I

7  appreciate the presentation of the evidence, which I

8  think helps.  I'd much rather have, you know, plenty to

9  go on than to feel that I'm trying to -- having to help

10 out one side or the other fill in the gaps or something

11 like that.  Both of you were thorough and did a good

12 job for your client, so I appreciate that.

13         MR. SULLY:  Thank you, Your Honor.  I had one

14 clarification, one request, Your Honor.

15         MS. GARCIA:  Yes.

16         MR. SULLY:  Regarding the travel, would it

17 just be Hidalgo and Starr or Cameron and I think

18 Willacy is the other one?

19         THE COURT:  So I was just going off the

20 Pretrial Report that just indicated that he travels for

21 work in Starr and Hidalgo County.  If you're saying

22 that maybe that will be part of the -- you could submit

23 that as part of the kind of confirmation of his current

24 employment.  I mean, that is one of the things that I

25 was wanting to see as far as to kind of verify that in

 1   fact he has been employed.  And if it's the case that

 2   his employer would need, you know, him to travel for

 3   work in those other counties, if they can indicate

 4   that, then I think that's fine.  I'd rather see

 5   Mr. Olivares working.  And so I think we can address it

 6   that way.

 7          MR. SULLY:  Very well, Your Honor.  And then

 8   the other request I had was just Mr. Olivares has

 9   indicated that he is not receiving his anxiety

10   medication.  And also where he's being held, I think

11   the lights are on throughout the night, which he

12   already has problems sleeping.  So perhaps that's a

13   situation that I think may take some time before we get

14   all these conditions, Your Honor, to make sure that his

15   needs are being met.

16          THE COURT:  Okay, and I will ask the marshals

17   to follow up with -- we want Mr. Olivares to be healthy

18   physically and mentally, and I'll ask the marshal to

19   follow up as far as his medication.  And I know that

20   they can't, you know, just have somebody bring by a

21   medication or something like that, so that he may need

22   to be visited by a doctor there to get them to issue

23   that.  But in any event, I'll ask the marshals to

24   follow on that.

25              And as far as the lights, I'm not sure

 1   what that circumstance is, but I'll ask the marshals to

 2   look into that.   If it's -- you know, I'm ultimately

 3   going to leave it to their discretion as far as if

 4   that's the situation generally for, you know, the

 5   people at the facility, then, you know, hopefully we

 6   can help out with getting Mr. Olivares the medication

 7   he needs and other assistance.   So, if that's a

 8   circumstance that -- in fact, I'll ask the marshal to

 9   look at that, and if it's a circumstance that shouldn't

10   be going on, certainly to get that corrected.   But I'll

11   leave it to them ultimately as to whether, you know,

12   that is something that can be or should be addressed.

13          MR. SULLY:   Yes, Your Honor.   It sounds like

14   he may be in the hole, and so -- and which would be

15   different from all other inmates are, which I don't

16   understand what the need would be.   So actually with

17   his mental health issues, that would actually be worse.

18   So if that's --

19          THE COURT:   Right.   And, yeah, I'll ask them

20   to look into the circumstances he's in.   I mean, I

21   understand that at least initially, I think most

22   individuals are separate when they -- at the very

23   beginning when they are, you know, awaiting medical

24   information and things like that.   So, hopefully, maybe

25   it will be something that will resolve itself.   Again,

```
 1  I'll ask the marshals to look at that.
 2          MR. SULLY:  Thank you, Your Honor.
 3          THE COURT:  Okay, thank you.  Y'all can be
 4  excused, then.
 5          [5:52 p.m. - Proceedings adjourned]
 6
 7                  C E R T I F I C A T I O N
 8
 9     I certify that the foregoing is a correct
10  transcript of the electronic sound recording of the
11  proceedings in the above-entitled matter.
12
13
14  /s/ Gwen Reed
15  7-28-19
16
17
18
19
20
21
22
23
24
25
```